SLIP OPINION

Cite as 2014 Ark. 1

# SUPREME COURT OF ARKANSAS

No. CR-13-173

| | | |
|---|---|---|
| JERRY LARD | | **Opinion Delivered** January 9, 2014 |
| | APPELLANT | |
| | | APPEAL FROM THE GREENE COUNTY CIRCUIT COURT [NO. CR 2012-173] |
| V. | | |
| | | |
| STATE OF ARKANSAS | | HONORABLE BRENT DAVIS, JUDGE |
| | APPELLEE | AFFIRMED. |

**COURTNEY HUDSON GOODSON, Associate Justice**

A jury in Greene County Circuit Court found appellant Jerry Lard guilty of capital murder, attempted capital murder, and possession of a controlled substance (methamphetamine), for which he received consecutive sentences of death, life, and ten years in prison, respectively. For reversal, Lard contends that the circuit court erred (1) by allowing the State to present evidence of bad acts and bad character; (2) by permitting repeated showings of the dash-camera videos depicting the crimes as they took place; (3) by failing to sequester victim-impact witnesses during the guilt phase of trial in violation of Rule 615 of the Arkansas Rules of Evidence; (4) by allowing the State to make improper remarks during closing arguments in both phases of trial; and (5) in denying Lard's motion to prohibit the State from seeking or imposing the death penalty, as well as permitting death qualification of the jury. Jurisdiction is properly in this court pursuant to Arkansas Supreme Court Rule 1-2(a)(2) (2013). We find no reversible error and affirm Lard's convictions and sentences.

SLIP OPINION

I. *Factual Background*

The prosecuting attorney in Poinsett County charged Lard by felony information with the above-referenced offenses[1] following a shooting that occurred in Trumann, Arkansas, during a traffic stop.[2] The facts underlying the charges are not in question, as the events in large part were captured by the dash cameras and audio equipment of the two police officers involved in the incident. This evidence reveals that, late in the evening on April 12, 2011, Officer Jonathan Schmidt of the Trumann Police Department initiated a stop of a vehicle driven by Brian Keith Elumbaugh. April Swanner, Elumbaugh's girlfriend, owned the vehicle and was sitting next to him in the front passenger seat. Another occupant of the vehicle, Nikki Pierce, sat in the back seat behind Elumbaugh. Lard also sat in the back but behind Swanner. Officer Schmidt ran a check on Elumbaugh's driver's license and learned that his license had been suspended and that there was an outstanding warrant for his arrest. Officer Schmidt asked Elumbaugh to exit the vehicle, and he placed Elumbaugh under arrest based on the warrant. At this point, Sergeant Corey Overstreet of the Trumann Police Department arrived in his cruiser to provide assistance during the stop. While Elumbaugh stood to the side in handcuffs, Officer Schmidt asked Pierce to exit the vehicle because he believed that she, too, might have had a warrant for her arrest. Officer Schmidt then leaned into the back

---

[1]The information also included a count of felon in possession of a firearm. The circuit court severed this offense from the other charges, and the court granted the State's request to nolle prosse this charge after trial.

[2]Although Trumann lies in Poinsett County, the case was tried in Greene County after the circuit court granted Lard's motion for a change of venue.

door where Pierce had been sitting and asked Lard for his name and date of birth. Upon learning Lard's information, Officer Schmidt relayed it to the dispatcher, who advised that arrest warrants had been issued for Lard. Officer Schmidt then walked around the back of Swanner's vehicle to the door where Lard was sitting. When Officer Schmidt opened the door, Lard stuck out his arm and shot Officer Schmidt in the chin with a .25-caliber pistol. Schmidt ran away from the car, and Lard quickly exited the vehicle, turned, and began firing at Sergeant Overstreet. Lard continued shooting as the officers scrambled for cover. Eventually, the officers met in front of Officer Schmidt's cruiser. Officer Schmidt dropped his .40-caliber Smith and Wesson Glock handgun, which he picked up but dropped again. Lard followed as the officers moved toward the rear of Officer Schmidt's vehicle on the passenger side. Sergeant Overstreet managed to return to his cruiser, but Officer Schmidt, who was wounded, remained beside his patrol car. As Lard approached Officer Schmidt, Lard exclaimed, "What you got now, what you got, bitch? Huh? What you got, bitch?" More gunshots were fired, and Lard again shouted, "What you got, bitch?" At this juncture, Officer Schmidt pleaded, "I'm down. I'm down. Please don't shoot me again." Additional gunshots rang out, and Lard again asked, "What the fuck you got?" The final words heard on the recording were Officer Schmidt's, when he begged, "Please don't shoot me again."

Moments later, Sergeant Overstreet shot Lard in the back as he attempted to leave the area. Where Lard fell, officers recovered Lard's .25-caliber pistol and Officer Schmidt's .40-caliber handgun. Neither weapon contained any remaining ammunition. Officers also discovered that Lard had .8154 grams of methamphetamine in his pocket. Subsequent testing



revealed that Lard had a low level of that substance in his system near the time of the incident.

Fortunately, Sergeant Overstreet escaped without injury. However, emergency-room personnel at St. Bernard's Medical Center in Jonesboro pronounced Officer Schmidt dead approximately one hour after the shooting. According to the testimony, Schmidt sustained four gunshot wounds. The most lethal one, fired at a range between several inches and two feet, entered Schmidt's right cheek adjacent to his nose, and the bullet passed through the right upper jawbone, fracturing the jawbone and teeth in that area. This bullet then traveled through Schmidt's tongue and lodged in his neck, but not before it completely transected the left common carotid artery. The bullet removed from Schmidt's neck was consistent with having been fired from a .40-caliber weapon. The gunshot that struck the left side of Schmidt's chin passed the left jawbone and carotid artery and exited the back of the neck on the left side. Schmidt also received a gunshot to the back of his right wrist. The bullet associated with this wound came to rest in the soft tissue at the base of his right thumb, and it matched forensically to Lard's pistol. The fourth gunshot caused a nonpenetrating wound to the right side of Schmidt's chest, as a result of a bullet striking his protective vest. The bullet recovered from Schmidt's vest had been fired from Lard's pistol.

In his testimony at trial, Elumbaugh stated that, before he exited the vehicle, he heard Lard say, "Looks like tonight's gonna be the night." While Lard was shouting and pursuing the officers in front of Officer Schmidt's vehicle, Elumbaugh saw Lard bend down and pick up something from the ground. Swanner testified that she also heard Lard say "tonight's the night" when Officer Schmidt first approached the car. She stated that she overheard the

SLIP OPINION

dispatcher inform Officer Schmidt about the warrants for Lard's arrest, and she testified that Lard said "here we go" as Schmidt approached Lard's door. Swanner further testified that she also saw Lard retrieve something from the ground as he stalked the officers around Schmidt's vehicle. She testified that she heard Lard say "die, motherfucker, die," as Officer Schmidt was begging for his life.

Lard did not deny that he committed the offenses. As his defense, Lard asserted that he lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law as a result of mental disease or defect. As support for this defense, Lard presented expert testimony that he had brain damage, possibly caused by head injuries he received as a child or induced by chronic methamphetamine abuse. Lard also introduced into evidence the results of his PET scan showing mildly decreased activity bilaterally in his mesial lobes. In rebuttal, the State offered the testimony of experts who disputed that Lard suffered from brain damage. As opposed to Lard's witnesses, the State's experts concluded that Lard's behavior was consistent with antisocial personality disorder, not a mental disease or defect.[3]

Upon hearing the evidence, the jury found Lard guilty of the capital murder of Officer Schmidt, attempted capital murder of Sergeant Overstreet, and possession of methamphetamine. Following the sentencing phase of trial, the circuit court sentenced Lard as previously stated in this opinion. Lard now appeals his convictions and sentences.

---

[3]As used in the Arkansas Criminal Code, "mental disease or defect" does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct. Ark. Code Ann. § 5-2-312(b) (Repl. 2006).



II.  *Prior Bad Acts and Character Evidence*

As his first point on appeal, Lard contends that the circuit court erred in allowing testimony that disclosed previous bad acts and evidence that reflected poorly on his character. More specifically, he claims error in the admission of testimony revealing that there were warrants for his arrest at the time of the shooting; that he had made threats to harm police officers; that he lacked remorse; that he had prior convictions and arrests; that he had violent propensities; that he had manufactured methamphetamine; and that he had a "Hell Bound" tattoo on his back. The State asserts in response that the circuit court did not abuse its discretion because the evidence possessed independent relevance and was not unfairly prejudicial.

The foundation for Lard's arguments is Rule 404(b) of the Arkansas Rules of Evidence, which provides as follows:

> Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Ark. R. Evid. 404(b) (2013). The first sentence of 404(b) sets out the general rule excluding evidence of a defendant's prior bad acts, while the second sentence provides an exemplary, but not exhaustive, list of exceptions to that rule. *Hamm v. State*, 365 Ark. 647, 232 S.W.3d 463 (2006). Evidence is not admissible under Rule 404(b) simply to show a prior bad act. *Laswell v. State*, 2012 Ark. 201, 404 S.W.3d 818. Rather, the test for admissibility under Rule 404(b) is whether the evidence is independently relevant, which means it must have a

SLIP OPINION

tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *Vance v. State*, 2011 Ark. 243, 383 S.W.3d 325.

Pursuant to Rule 403 of the Arkansas Rules of Evidence, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ark. R. Evid. 403 (2013). Thus, a trial court may refuse to admit evidence that is unfairly prejudicial to the defendant, even if it might be relevant. *Lockhart v. State*, 2010 Ark. 278, 367 S.W.3d 530. This court has observed that evidence offered by the State is often likely to be prejudicial to the accused, but the evidence should not be excluded unless the accused can show that it lacks probative value in view of the risk of unfair prejudice. *Chunestudy v. State*, 2012 Ark. 222, 408 S.W.3d 55.

The admission or rejection of evidence under Rule 404(b) is committed to the sound discretion of the circuit court, and this court will not reverse absent a showing of manifest abuse of discretion. *Dimas-Martinez v. State*, 2011 Ark. 515, 385 S.W.3d 238. Likewise, the balancing mandated by Rule 403 is also a matter left to a circuit court's sound discretion, and an appellate court will not reverse the circuit court's ruling absent a showing of manifest abuse. *Croy v. State*, 2011 Ark. 284, 383 S.W.3d 367. Abuse of discretion is a high threshold that does not simply require error in the circuit court's decision, but requires that the circuit court act improvidently, thoughtlessly, or without due consideration. *Craigg v. State*, 2012 Ark. 387, ___ S.W.3d ___.



A. Warrants and Previous Threats

Prior to trial, Lard moved in limine to prohibit the State from offering testimony that warrants for his arrest existed at the time of the incident. He also urged the circuit court to exclude testimony that he had threatened to harm police officers prior to the shooting. Based on the State's arguments, the circuit court denied Lard's motion in limine, ruling that the proposed testimony on these subjects was admissible to show motive, intent, plan, and Lard's state of mind when the shooting occurred. However, the court also ruled that the State could not reveal the charges for which the warrants had been issued.

Pursuant to the circuit court's decision, the State elicited testimony from Elumbaugh that Lard knew about a warrant for his arrest. Elumbaugh further testified that Lard referred to his gun as a "p-shooter," meaning "police shooter," and said that Lard had stated that "if they ever try to come after me, there's gonna be a war," and that Lard had warned him "if you ever get pulled over and I'm with you, you better try to get away because I'm gonna be shootin'." He added that Lard made these statements within several months of the incident. In addition, Swanner testified that she had been told that Lard had an outstanding arrest warrant regarding child support.[4] She also testified that Lard advised her that, if he were to be stopped by the police, he "would take half of 'em with him."

---

[4]Lard did not object when Swanner mentioned that the warrant involved child support. He also does not claim error for the violation of the circuit court's ruling prohibiting testimony about the nature of the offense underlying the warrant. We also note that Dr. Raymond Molden, a State rebuttal witness, testified that Lard owed $42,000 in back child support. Lard raised no objection to Molden's testimony, but Dr. Molden did not testify that there was a warrant for Lard's arrest for the nonpayment of child support.



When the purpose of evidence is to show motive, anything and everything that might have influenced the commission of the act may, as a rule, be shown. *Anderson v. State*, 2011 Ark. 461, 385 S.W.3d 214. Evidence may be independently relevant if it shows motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. *Smith v. State*, 2010 Ark. 75, 364 S.W.3d 443. Additionally, any evidence that is relevant to explain the act, show a motive, or illustrate the accused's state of mind, may be independently relevant and admissible. *Brunson v. State*, 368 Ark. 313, 245 S.W.3d 132 (2006); *Gaines v. State*, 340 Ark. 99, 8 S.W.3d 547 (2000).

The State's theory in this case was that Lard began shooting at the officers in order to avoid arrest. The evidence produced at trial showed that Officer Schmidt had arrested Elumbaugh based on an outstanding warrant and that he was running checks on the other occupants of the vehicle, including Lard, to determine whether they were wanted as well. Therefore, evidence revealing that Lard had warrants for his arrest and that Lard had knowledge of this fact was independently relevant to establish a motive for his actions. As for Lard's threats, in order to prove capital murder and attempted capital murder, the State was required to show that Lard acted with premeditation and deliberation. *See* Ark. Code Ann. § 5-10-101(a)(3) (Supp. 2011). Lard's previous threats to shoot police officers if confronted were thus independently relevant as proof of his intent, plan, and state of mind. We conclude that the testimony concerning warrants and threats was highly probative, not unfairly prejudicial, and was admitted for appropriate purposes under Rule 404(b). Therefore, we hold that the circuit court did not abuse its discretion by allowing the introduction of this

testimony.

## B.  Other Bad Acts and Lack of Remorse

The testimony at issue under this subpoint relates to Lard's defense of mental disease or defect and arose during the State's cross-examination of one of Lard's expert witnesses and during the State's case in rebuttal.  To place these matters in context, it is necessary to recount the pertinent testimony in detail.

Dr. Barry Crown, a neuropsychologist, testified on Lard's behalf.  He conducted a clinical interview of Lard and administered a series of tests to gauge Lard's intellectual functioning.  Crown stated that it was important to obtain basic information about a person during an interview in order to place the test results in context.  Crown testified that Lard's intellectual functioning was impaired.  Although Crown stated that Lard was not mentally retarded, he said that Lard's full-scale intelligence quotient of 70 met the intellectual criteria for mental retardation, and he placed Lard's age equivalency at ten years and five months. Crown testified that persons with a low IQ have difficulty "figuring things out" and that it is hard for those individuals to imagine and to think in abstract terms.  He further testified that Lard had organic brain damage impacting the bilateral frontotemporal lobe functioning, which led to functional impairments in memory, reasoning, judgment, and language-based critical thinking. He attributed Lard's deficits either to multiple head trauma with loss of consciousness or to methamphetamine abuse beginning at age seventeen.  Crown offered the opinion that Lard's ability to conform his conduct to the requirements of the law was impaired.  In further testimony, Crown said that his testing did not lead him to believe that



Lard suffered from antisocial personality disorder. He also testified that it is not appropriate to make that diagnosis when there is evidence of brain damage.

During the State's cross-examination, Crown acknowledged that Lard attended school through the seventh grade, did not take special-education classes, lived on his own since age sixteen, had a cell phone, sent text messages, took care of his own hygiene, and kept himself fed and clothed. Crown stated that Lard also told him that he had been expelled from three different schools, but Crown was not certain whether Lard revealed that he was kicked out of one school for hitting someone over the head with a metal chair. Crown testified that he was not aware that Lard had lost one job after handcuffing the boss's son to a scaffold and kicking him off of it. Over Lard's objection, the State was allowed to ask Crown whether Lard told him that he had manufactured methamphetamine. Crown replied that Lard had not.

The State further questioned Crown about the criteria for diagnosing antisocial personality disorder, as involving a pervasive pattern of disregarding the rights of others occurring since age fifteen, as indicated by three or more behaviors out of a list of seven behavioral categories.[5] Crown stated that Lard recounted a history of fights and aggressive

---

[5]According to the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), the diagnostic criteria for antisocial personality disorder involves a pervasive pattern of disregard for and violation of the rights of others occurring since age fifteen, as indicated by three (or more) of the following: (1) the failure to conform to social norms with respect to lawful behaviors, as indicated by repeatedly performing acts that are grounds for arrest; (2) deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure; (3) impulsivity or failure to plan ahead; (4) irritability and aggressiveness, as indicated by repeated physical fights or assaults; (5) reckless disregard for safety of self or others; (6) consistent irresponsibility, as indicated by repeated failure to sustain consistent

behavior; several arrests; numerous thefts, including the theft of a car; intentionally damaging the property of others; starting fires, beginning at age fifteen; cruelty to animals, including setting a cat on fire; and losing jobs as a result of aggressive behavior. Crown acknowledged that Lard met four or five of the criteria for antisocial personality disorder, but Crown maintained that he did not make that diagnosis based on his opinion that Lard had brain damage in the areas that create many of the same symptoms. Crown further testified that Lard had admitted that he was fearful of being arrested because of a warrant for his arrest at the time of the shooting.

Dr. Courtney Rocho, a psychologist, testified for the State in rebuttal. Rocho conducted a forensic interview of Lard, and she stated that she relied on historical information provided by Lard in forming her opinions. Over Lard's objection, she said that Lard related a history of disciplinary problems in school involving multiple suspensions and expulsions. Rocho testified that Lard had told her that school administrators once placed him in isolation for striking a school official over the head with a metal chair. She stated that Lard described other antisocial behavior showing a history of impulsivity, aggression, irritability, irresponsibility, and repeated unlawful acts. These behaviors included cruelty to animals, beginning at age nine, as Lard had admitted kicking animals and setting a cat on fire; causing damage to the property of others; and stealing, starting at age twelve, including the theft of a car. Based on the litany of behaviors Lard described, Rocho diagnosed Lard with antisocial

work behavior or honor financial obligations; and (7) lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another.

personality disorder. She testified that he had this conduct disorder at age fifteen and that Lard continued this behavior throughout his life. In her testimony, Rocho also noted problems in the manner in which Crown administered the IQ test. She further testified that Lard did not have a mental disease or defect and that he was functioning appropriate to his age of thirty-seven years old at the time of her examination. Rocho stated that Lard could think ahead and that he had the ability to deliberate and make a choice of conduct among different options. She expressed the view that Lard had the capacity to appreciate the criminality of his conduct and that he had the ability to conform his conduct to the requirements of the law.

Dr. Raymond Molden, a psychiatrist, concurred in the diagnosis of antisocial personality disorder. In addition to the behavioral criteria noted by Dr. Rocho, he also noted that a lack of remorse was consistent with that diagnosis. Molden further testified that he did not find any evidence of brain damage, noting that the PET scan revealed no frontal–lobe damage and showed only slightly less than average brain activity at the mesial temporal lobes. He also stated that Lard's level of functioning was inconsistent with someone who had brain damage. Molden testified that Lard did not have a mental disease or defect, and he stated that Lard had the capacity both to appreciate the criminality of his conduct and conform his conduct to the requirements of the law. He said that his opinion was influenced in part by Lard's description of how he once had a family member pawn a gun for him because he knew that, as a felon, he could not pawn the weapon himself.[6]

In rebuttal, the State also presented the testimony of a jailer who overheard Lard say

---

[6]At Lard's request, the circuit court admonished the jury to disregard this comment.

to an inmate, "It's funny that I shot one cop and the other one is still walking. I should have shot him, too." Another jailer also testified that he heard Lard tell an inmate that the only thing he regretted about that night was that he "didn't get the other motherfucker, too."

On appeal, Lard contends that the circuit court erred in overruling his objections scattered throughout the testimony of these witnesses identifying multiple instances of other bad acts and character evidence. He also claims error in the admission of testimony indicating a lack of remorse. We disagree with Lard's arguments. Rule 703 of the Arkansas Rules of Evidence provides that, if the facts upon which an expert bases his or her opinion are of a type reasonably relied upon by experts in the particular field in forming opinions on the subject, the facts need not be admissible in evidence. Under this rule, an expert witness must be allowed to disclose to the jury the factual basis for his or her opinion because the opinion would otherwise be unsupported, and the jury would be left with little, if any, means of evaluating its correctness. *See House v. Volunteer Transp. Co.*, 365 Ark. 11, 223 S.W.3d 798 (2006); *J.E. Merit Constructors v. Cooper*, 345 Ark. 136, 44 S.W.3d 336 (2001).

In this case, Lard squarely placed his mental status in issue by asserting the defense of mental disease or defect. In support of that defense, he offered expert testimony that he had sustained brain damage as evidenced by a low IQ and a PET scan showing decreased activity in the mesial frontotemporal lobes. In rebuttal, the State presented opposing expert testimony diagnosing Lard with antisocial personality disorder. According to the testimony, this disorder is characterized by a pervasive pattern of certain behaviors exhibited since age fifteen. The State's witnesses testified that the history of misconduct related by Lard and his lack of

remorse following the incident formed the basis for the diagnosis.

It is clear to this court that the testimony of the State's experts revealing other bad acts committed by Lard was offered for the purpose of supporting the opinions reached by the State's experts by apprising the jury of the factual basis underlying the diagnosis of antisocial personality disorder. For that reason, the testimony was independently relevant and admissible. *Miller v. State*, 2010 Ark. 1, 362 S.W.3d 264 (holding that testimony concerning previous acts of violence was admissible where the information formed the basis of the forensic evaluator's opinion). We also note that the circuit court properly instructed the jury that the evidence of alleged crimes, wrongs, and acts was not to be considered as proof that Lard acted in conformity with those behaviors and that the evidence was merely offered as a factor considered by the expert witnesses in evaluating Lard's mental status.

We also conclude that the circuit court did not abuse its discretion by permitting the jailers' testimony indicating that Lard lacked remorse for killing Officer Schmidt. As noted by Dr. Molden, lack of remorse is one of the criteria for diagnosing antisocial personality disorder. The jailers' testimony did not violate Rule 404(b) because it was not offered as character evidence. Rather, the testimony was independently relevant to refute Lard's claim of mental disease or defect, as the testimony provided support for the experts' opinions that Lard had this disorder and not a mental disease or defect. *See Wood v. State*, 280 Ark. 248, 657 S.W.2d 528 (1983) (holding in murder prosecution that testimony of the defendant's sexual relationship with his daughter was admissible to rebut the defense of mental disease or defect).

SLIP OPINION

With one exception, the State was also entitled to question Dr. Crown regarding the acts of misconduct. This court has traditionally taken the view that the cross-examiner should be given wide latitude because cross-examination is the means by which to test the truth of the witness's testimony and the witness's credibility. *McCoy v. State*, 2010 Ark. 373, 370 S.W.3d 241; *Fowler v. State*, 339 Ark. 207, 5 S.W.3d 10 (1999); *Wilson v. State*, 289 Ark. 141, 712 S.W.2d 654 (1986). This court has held that once an expert is qualified, the weaknesses in any factual underpinning of the expert's opinion may be exposed on cross-examination, and such a weakness goes to the weight and credibility of the expert's testimony. *Suggs v. State*, 322 Ark. 40, 907 S.W.2d 124 (1995). Here, it was permissible for the State to challenge the factual basis for Dr. Crown's opinion that Lard did not have antisocial personality disorder and to test whether Dr. Crown's rejection of that diagnosis was made with full knowledge of Lard's past behaviors and history. Even if there was error in the State's cross-examination of Dr. Crown, the error would be harmless because the evidence was properly admitted during the rebuttal testimony of the State's witnesses. Prejudice cannot be demonstrated where erroneously admitted evidence is merely cumulative to other evidence that is properly admitted. *Holloway v. State*, 2013 Ark. 140, ___ S.W.3d ___.

The exception is the question asked of Dr. Crown about Lard's manufacturing of methamphetamine. In this respect, the circuit court allowed the State to inquire if Lard disclosed that he had manufactured this substance. Unlike the other behaviors, we perceive little independent relevance for this testimony. However, we discern no reversible error. Lard relied on his past use of methamphetamine in support of his claim of brain damage, and



he introduced testimony indicating his chronic use of that substance. The reference to manufacturing methamphetamine during the State's cross-examination of Dr. Crown was brief, and no other testimony on the subject was elicited. We have held that, even when a circuit court errs in admitting evidence, we may declare the error harmless and affirm when the evidence of guilt is overwhelming and the error is slight. *Kelley v. State*, 2009 Ark. 389, 327 S.W.3d 373; *see also Miller, supra* (recognizing that the components of harmless-error analysis applicable to an evidentiary ruling in the guilt phase of a capital-murder trial are whether there is overwhelming evidence of guilt and the error is slight). That is the case here. Given the overwhelming evidence of guilt, we conclude that the error in admitting this testimony was harmless.

### C. Tattoo

Lard contends that the circuit court abused its discretion by admitting two photographs of a large tattoo on his back entitled "Hell Bound," which purportedly portrays the gates of hell. He asserts that the tattoo had no bearing on any relevant issue and that the photographs were admitted solely to prejudice the jury against him. Lard also notes that he proffered another one of his drawings as a substitute for the photographs of the tattoo.

During the State's case in rebuttal, Lard's brother identified the photographs as depicting Lard's tattoo, and he testified that Lard designed the image. The State utilized the photographs in its examination of the expert witnesses. Dr. Crown, who testified that Lard's age equivalency was age ten and five months, stated that the design did not suggest a high order of function, and he remarked that "fifth and sixth graders are pretty artistic, too." Dr.



Rocho testified that the intricate design of the tattoo demonstrated that Lard had the ability to plan and organize and that the design was indicative of substantial and significant executive functioning. Dr. Molden described the tattoo as being complex and detailed. He stated that the design required abstraction, attention to detail, and a high degree of concentration and planning. Dr. Garrett Andrews, another expert witness for the State, disagreed with Dr. Crown's opinion about the tattoo and said that it was not a drawing that a ten year old could complete.

We have held that the admission of photographs is a matter left to the sound discretion of the circuit court, and we will not reverse absent an abuse of that discretion. *Anderson v. State*, *supra*. Even inflammatory photographs are admissible in the sound discretion of the circuit court if they tend to shed light on any issue or are useful to enable the jury to better understand the testimony or to corroborate the testimony. *Fairchild v. State*, 284 Ark. 289, 681 S.W.2d 380 (1984). Here, the State introduced the photographs in conjunction with expert testimony to demonstrate that Lard had the ability to complete intricate drawings and to think abstractly in order to show that he possessed a degree of cognitive abilities beyond that claimed by Dr. Crown. As the photographs were relied on by the State's experts and were offered to refute Lard's claim of brain damage and the defense of mental disease and defect, the photographs were independently relevant and admissible for those purposes. We acknowledge that the admission of the photographs resulted in some prejudice, but we find no manifest abuse of discretion in the circuit court's conclusion that the probative value of the photographs exceeded their prejudicial effect. Nor can we say that the circuit court erred by



rejecting Lard's offer to introduce the proffered drawing instead of the photographs of the tattoo. The proffered drawing is comparatively simple and does not contain the degree of complexity as the tattoo. We find no error on this point.

### III. *Dash-Camera Videos*

Lard next argues that the circuit court erred by allowing the State to play the two videos recorded from the dash cameras mounted on both Officer Schmidt's and Sergeant Overstreet's cruisers. In addition, Lard claims error because the circuit court permitted the State to play different versions of the videos, which included a compilation or side-by-side view of both videos; the video from Officer Schmidt's vehicle in slow motion starting at the first shot without audio; the video from Sergeant Overstreet's vehicle in slow motion beginning at the first shot without audio; and a slow-motion compilation or side-by-side view from both vehicles starting at the first shot without audio. Lard contends that the videos were prejudicial, cumulative, and unnecessary because there were eyewitnesses who observed the events and because he did not dispute that he killed Officer Schmidt while Schmidt was acting in the line of duty. He maintains that the videos were offered for no other purpose than to arouse the passions of the jurors.

As a general matter, all relevant evidence is admissible. Ark. R. Evid. 402. Relevant evidence is evidence that has a "tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Ark. R. Evid. 401. Evidence, although relevant, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Ark. R.

SLIP OPINION

Evid. 403.

Video evidence is admissible "if it is relevant, helpful to the jury, and not prejudicial." *Hickson v. State*, 312 Ark. 171, 176, 847 S.W.2d 691, 694 (1993). The same requirements for the admission of photographs apply to the admission of video evidence. *Williams v. State*, 374 Ark. 282, 287 S.W.3d 559 (2008). We have held that the admission of photographs is a matter left to the sound discretion of the circuit court, and we will not reverse absent an abuse of that discretion. *Breeden v. State*, 2013 Ark. 145, ___ S.W.3d ___. When photographs are helpful to explain testimony, they are ordinarily admissible. *Blanchard v. State*, 2009 Ark. 335, 321 S.W.3d 250. Moreover, the mere fact that a photograph is inflammatory or is cumulative is not, standing alone, sufficient reason to exclude it. *Sweet v. State*, 2011 Ark. 20, 370 S.W.3d 510. Even the most gruesome photographs may be admissible if they assist the trier of fact in any of the following ways: by shedding light on some issue, by proving a necessary element of the case, by enabling a witness to testify more effectively, by corroborating testimony, or by enabling jurors to better understand the testimony. *Decay v. State*, 2009 Ark. 566, 352 S.W.3d 319.

Yet, we have rejected a carte blanche approach to the admission of photographs. *Robertson v. State*, 2011 Ark. 196; *Newman v. State*, 353 Ark. 258, 106 S.W.3d 438 (2003). We have cautioned against "promoting a general rule of admissibility which essentially allows automatic acceptance of all the photographs of the victim and crime scene the prosecution can offer." *Berry v. State*, 290 Ark. 223, 228, 718 S.W.2d 447, 450 (1986). We require the trial court to consider whether such evidence, although relevant, creates a danger of unfair

prejudice, and then to determine whether the danger of unfair prejudice substantially outweighs its probative value. *Camargo v. State*, 327 Ark. 631, 940 S.W.2d 464 (1997).

We find no abuse of discretion in the circuit court's decision that the probative value of the various video recordings substantially outweighed the danger of unfair prejudice. Typically, the commission of a crime is not video recorded, as was the case here. Although there were witnesses to the events, the recordings represent an objective portrayal of what occurred during the traffic stop and served both to corroborate and to explain the eyewitnesses' testimony. From our review of the videos, the footage of the actual shootings lasts less than fifty seconds. Because the incident unfolded so quickly, showing the events as they transpired from different perspectives and at slowed speeds allowed the actions of all involved to be clarified and placed in context. Although Lard did not deny committing the offenses, this court has repeatedly held that a defendant cannot prevent the admission of evidence simply by conceding to the facts of the crime. *Holloway v. State*, 363 Ark. 254, 213 S.W.3d 633 (2005); *Garcia v. State*, 363 Ark. 319, 214 S.W.3d 260 (2005); *Smart v. State*, 352 Ark. 522, 104 S.W.3d 386 (2003). More specifically, we have held that photographic evidence is not inadmissible on grounds that it is cumulative or unnecessary due to admitted or proven facts. *Watson v. State*, 308 Ark. 643, 826 S.W.2d 281 (1992); *Cotton v. State*, 276 Ark. 282, 634 S.W.2d 127 (1982). Equally as clear, the State is entitled to prove its case as conclusively as it can. *Davis v. State*, 368 Ark. 401, 246 S.W.3d 862 (2007); *Jones v. State*, 349 Ark. 331, 78 S.W.3d 104 (2002). Here, the circuit court exercised its discretion to disallow a portion of the recordings that it deemed overly inflammatory. Undeniably, there is a degree

SLIP OPINION



of prejudice attached to showing the videos, but we cannot conclude that the prejudice was unfair. Accordingly, we affirm on this point.

To the extent that Lard argues that the State should not have been allowed to show portions of the videos during closing arguments, we observe that he did not object when that was done. We will not consider arguments that are raised for the first time on appeal. *Scamardo v. State*, 2013 Ark. 163, ___ S.W.3d ___.

IV. *Witness Sequestration*

With this point on appeal, Lard asserts that the circuit court erred by not following the strict dictates of Rule 615 of the Arkansas Rules of Evidence to allow Officer Schmidt's wife, his father, and his brother to remain in the courtroom during the guilt phase of trial and then to permit them to offer victim-impact testimony at sentencing. On this issue, the record reflects that, at the beginning of trial, Lard invoked the witness-sequestration rule pursuant to Rule 615. The State asked that Officer Schmidt's wife and other family members be excused from the rule because they would be testifying only during the sentencing phase of trial, depending on the jury's verdict, but not the guilt phase of trial. Lard objected, arguing that the rule was mandatory and that there was no exception for adult members of the victim's family. The circuit court ruled that Rule 615 applied to victim-impact witnesses who might testify at sentencing, and the court ordered Officer Schmidt's family members who proposed to testify at sentencing to remain outside the courtroom during trial.

Following opening statements, the State asked the circuit court to reconsider its decision to exclude Officer Schmidt's family members, particularly his wife, because their

SLIP OPINION

testimony would only be offered at a sentencing hearing if the jury rendered verdicts of guilt. The circuit court altered its ruling. Although recognizing that the rule is mandatory, the court noted that the family members had reduced their victim-impact statements to writing and ruled that they would be allowed to stay in the courtroom during the guilt phase of trial on the condition that they confine their testimony to the written statements. In its ruling, the circuit court reasoned that the purpose of the rule would not be thwarted by allowing their presence during the guilt phase of trial and that it could conceive of no possible prejudice resulting from their remaining in the courtroom. Lard raised the issue again at sentencing, but the circuit court declined to exclude the witnesses' testimony. As a result, Officer Schmidt's wife, father, and brother testified at sentencing by reading their written statements concerning the emotional impact the murder had on them and their family. Additionally, Mrs. Schmidt identified and gave brief descriptions of photographs of Officer Schmidt and his family members for the admission of the photographs into evidence.

Rule 615, which sets out the rule on witness sequestration, provides as follows:

At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize the exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party that is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause.

The purpose of Rule 615 is to expose inconsistencies in the testimony of different witnesses and to prevent the possibility of one witness's shaping his or her testimony to match that given by other witnesses at trial. *Adams v. State*, 2013 Ark. 174, ___ S.W.3d ___. Exclusion is mandatory upon request by either party, and only specific exceptions exist to allow

SLIP OPINION

witnesses to remain in the courtroom. *Id.* In addition to the exceptions listed in the rule, Rule 616 of the Arkansas Rules of Evidence provides that the victim of the crime, as well as the parent, guardian, or custodian of a minor victim, has the right to be present during the trial notwithstanding Rule 615. However, a murder victim's family members do not fit within this exception to the rule. *See Solomon v. State*, 323 Ark. 178, 913 S.W.2d 288 (1996) (holding that a murder victim's daughters were subject to the rule of sequestration).

Based on the rule, the circuit court committed error by not sequestering the victim-impact witnesses. The rule is mandatory and requires the exclusion of witnesses when it is invoked, and the members of a murder victim's family do not fall within any recognized exception. Even so, this court has consistently held that it will not reverse the circuit court's decision regarding this issue absent a showing of prejudice, as prejudice is not presumed. *Adams*, *supra*. However, to hold as harmless an error occurring in the penalty phase of a capital-murder trial, we must be able to reach the conclusion that the error was harmless beyond a reasonable doubt. *See Miller*, *supra*. We reach that conclusion here. The witnesses in this instance gave victim-impact testimony limited to previously written statements concerning how the loss of Officer Schmidt affected their lives. In addition, Mrs. Schmidt gave brief descriptions of the photographs that were introduced into evidence. The witnesses otherwise did not offer any testimony about the facts surrounding the murder that were disclosed during the guilt phase of trial, nor could they, because victim-impact witnesses in a capital trial may not state "characterizations and opinions about the crime, the defendant, and the appropriate sentence." *Id*. at 34, 362 S.W.3d at 285 (quoting *Parker v. Bowersox*, 188



F.3d 923, 931 (8th Cir. 1999)). Thus, the witnesses' testimony did not contravene the purpose of the sequestration rule, as theirs was not the kind of testimony that is susceptible to being materially altered by any testimony presented during the guilt-phase of trial. Therefore, we hold that the circuit court's failure to abide by Rule 615 was harmless beyond a reasonable doubt.

Lard asserts that there was a "possibility" of prejudice because "the very presence of these witnesses in the courtroom for ten days made their testimony all the more poignant for the jury, and stoked the flames of passion and empathy for someone the jury had come to know during the course of trial." However, the purpose of the rule is to prevent witnesses from adjusting their testimony based on what they have heard prior witnesses say. *Adams*, *supra*. The rule is not intended to shield potential witnesses from the view of the jury. Moreover, this argument dehors the record, as there is nothing to indicate what effect, if any, the presence of the family members may or may not have had on the jury. We will not engage in such speculation.

## V. *Closing Arguments*

In this issue on appeal, Lard first argues that the circuit court erred in allowing the prosecuting attorneys to make improper remarks during closing argument in the guilt stage of trial. He contends that the prosecutors improperly referred to the bad-acts evidence complained of in the first point on appeal. Lard also asserts that the prosecuting attorneys interjected their personal beliefs and made objectionable remarks concerning his defense and claim of brain damage by calling the evidence a "magic act," "a ploy," "misleading," an

attempt to "derail and confuse," an effort to "harbor voluntary conduct," an "excuse," a "joke," a "red herring," "ridiculous," and "insulting to the [jurors'] intelligence." The State counters Lard's assertions by arguing that the remarks were proper commentary on the evidence that merely urged the jury to give little weight to Lard's defense.

Closing arguments must be confined to questions in issue, the evidence introduced during trial, and all reasonable inferences and deductions which can be drawn therefrom. *Rohrbach v. State*, 374 Ark. 271, 287 S.W.3d 590 (2008). "Although it is not good practice for counsel to inject their personal beliefs into the closing arguments, mere expressions of opinion by counsel in closing argument are not reversible error so long as they do not purposely arouse passion and prejudice." *Jefferson v. State*, 372 Ark. 307, 321–22, 276 S.W.3d 214, 225 (2008) (quoting *Neff v. State*, 287 Ark. 88, 94, 696 S.W.2d 736, 740 (1985)). We have stated many times that the trial court is given broad discretion to control counsel in closing arguments, and we do not interfere with that discretion absent a manifest abuse of discretion. *Rohrbach v. State*, *supra*; *Leaks v. State*, 339 Ark. 348, 5 S.W.3d 448 (1999); *Noel v. State*, 331 Ark. 79, 960 S.W.2d 439 (1998).

Here, Lard concedes that he raised no objection to any of the prosecutors' remarks. Absent a contemporaneous objection at trial, we will not review alleged errors in the State's closing argument. *See Anderson v. State*, 357 Ark. 180, 163 S.W.3d 333 (2004); *see also Bowen v. State*, 322 Ark. 483, 911 S.W.2d 555 (1995). Despite the absence of an objection at trial, Lard urges this court to apply the third exception to the contemporaneous-objection rule set forth in *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980). In *Wicks*, we said,

> A third exception is a mere possibility, for it has not yet occurred in any case. That relates to the trial court's duty to intervene, without an objection, and correct a serious error either by an admonition to the jury or by ordering a mistrial. We implied in *Wilson v. State*, 126 Ark. 354, 190 S.W. 441 (1916), that no objection is necessary if the trial court fails to control a prosecutor's closing argument and allows him to go too far: "Appellant can not predicate error upon the failure of the court to make a ruling that he did not at the time ask the court to make, unless the remarks were so flagrant and so highly prejudicial in character as to make it the duty of the court on its own motion to have instructed the jury not to consider the same. *See Kansas City So. Ry. Co. v. Murphy*, 74 Ark. 256 [85 S.W. 428 (1905)]; *Harding v. State*, 94 Ark. 65 [126 S.W. 90 (1910)]."

*Wicks*, 270 Ark. at 786, 606 S.W.2d at 369–70. Our case law is clear that *Wicks* presents only narrow exceptions that are to be rarely applied. *Chunestudy v. State*, *supra*. Specifically, this court has held that the third exception is limited to only those errors affecting the very structure of the criminal trial, such as the fundamental right to a trial by jury, the presumption of innocence, and the State's burden of proof. *White v. State*, 2012 Ark. 221, 408 S.W.3d 720. The remarks Lard complains of here do not rise to this level. Therefore, we decline to address Lard's arguments that are being raised for the first time on appeal.

Lard further contends that the prosecuting attorney's closing argument at the sentencing phase of trial was also objectionable. Lard claims error in that portion of the argument where the prosecutor stated that the death penalty served as a deterrent to prevent others from killing a police officer. He argues that the remarks were improper because they had the effect of telling the jury that they were the conscience of the community and that they should send a message to others who might consider killing a police officer.

Arkansas Code Annotated section 16-90-801(a)(5) (Repl. 2006) provides that a primary purpose of sentencing a person convicted of a crime is to "deter criminal behavior



and foster respect for the law." Therefore, we cannot conclude that the circuit court abused its discretion in overruling Lard's objection to the State's comment. Also, contrary to Lard's assertion, this court has held that "send a message" themes from the prosecutor in closing arguments are not improper. *Lee v. State*, 340 Ark. 504, 11 S.W.3d 553 (2000); *Muldrew v. State*, 331 Ark. 519, 963 S.W.2d 580 (1998); *Love v. State*, 324 Ark. 526, 922 S.W.2d 701 (1996). Consequently, we find no merit in Lard's contention.

VI. *Ex Post Facto*

As the final point on appeal, Lard argues that the death penalty was not a permissible sentencing option in his case because, approximately one month before his trial, this court struck down as unconstitutional the Method of Execution Act in *Hobbs v. Jones*, 2012 Ark. 293, ___ S.W.3d ___. Lard presented this argument by pretrial motion to prohibit the State from seeking or imposing the death penalty and to prohibit the death qualification of the jury. As he argued below, Lard asserts on appeal that any method-of-execution statute enacted subsequent to the date of the offenses would violate the prohibition against ex post facto laws under the United States and Arkansas Constitutions, and in turn, the guarantees of due process and the prohibition against cruel and unusual punishment found in the constitutions. Lard contends that, because there was no valid constitutional method of execution in existence at the time of the crime or when he was convicted, any subsequently enacted statute proscribing a method of executing him would clearly provide a greater punishment than was permitted

at the time of his crime and conviction.[7]

An ex post facto law is one that makes an action done before the passing of the law, and which was innocent when done, criminal or one that aggravates a crime, or makes it greater than it was, when committed. *Young v. Norris*, 365 Ark. 219, 226 S.W.3d 797 (2006); *Garrett v. State*, 347 Ark. 860, 69 S.W.3d 844 (2002). For the Ex Post Facto Clause to apply, there must be a change in the law that either criminalizes a previously innocent act or that increases the punishment received for an already criminalized act. *Young*, *supra*; *Jones v. State*, 347 Ark. 455, 65 S.W.3d 402 (2002). "[T]wo critical elements must be present for a criminal or penal law to be ex post facto: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." *Weaver v. Graham*, 450 U.S. 24, 29 (1981). A law is retrospective if it "changes the legal consequences of acts completed before its effective date." *Miller v. Florida*, 482 U.S. 423, 430 (1987), *overruled in part on other grounds*, *Cal. Dep't of Corrections v. Morales*, 514 U.S. 499 (1995).

The constitutional inhibition of ex post facto laws was intended to secure substantial personal rights against arbitrary and oppressive legislative action, and not to obstruct mere alteration in the conditions deemed necessary for the orderly infliction of humane punishment. *Malloy v. South Carolina*, 237 U.S. 180 (1915). The constitutional prohibition is not intended "to limit the legislative control of remedies and modes of procedure which do

---

[7]Following Lard's trial, the General Assembly passed new legislation to provide a method of administering lethal injections. *See* Act 139 of 2013. The new law is not under consideration in this appeal.

not affect matters of substance." *Dobbert v. Florida*, 432 U.S. 282, 293 (1977). Thus, even though it may work to the disadvantage of the accused, a procedural change is generally considered not to be ex post facto. *Id.*

In *Jones*, *supra*, we determined that the Method of Execution Act, codified at Arkansas Code Annotated section 5-4-617 (Supp. 2011), was unconstitutional on its face. This court held that the statute violated separation of powers because the General Assembly had improperly delegated legislative authority by giving unfettered discretion, without sufficient guidelines for the use of that discretion, to the Arkansas Department of Correction to determine all protocol and procedures, most notably the chemicals to be used, for a state execution.

Relevant here is the Supreme Court's decision in *Dobbert*, *supra*. In that case, the Florida death-penalty statute in effect at the time Dobbert committed the offense was declared unconstitutional before his trial. The Florida legislature subsequently enacted a new death-penalty procedure. Dobbert was tried under the new sentencing scheme, and he made several arguments based on the Ex Post Facto Clause. In one of those arguments, he asserted, like Lard does in the present case, that there was no valid death-penalty law in effect as of the date of his actions because the law in effect at that time had been ruled unconstitutional. The Supreme Court unequivocally rejected this contention, saying that "this sophistic argument mocks the substance of the Ex Post Facto Clause." *Dobbert*, 432 U.S. at 297. The Court reasoned that whether or not the death-penalty statute in effect at the time of the offenses was subsequently deemed unconstitutional, the statute, nonetheless,

30

clearly indicated Florida's view of the severity of murder and of the degree of punishment which the legislature wished to impose upon murderers. The statute was intended to provide maximum deterrence, and its existence on the statute books provided fair warning as to the degree of culpability which the State ascribed to the act of murder.

. . . .

Here the existence of the statute served as an "operative fact" to warn the petitioner of the penalty which Florida would seek to impose on him if he were convicted of first-degree murder. This was sufficient compliance with the ex post facto provision of the United States Constitution.

*Id.* at 297–98.

In light of the decision in *Dobbert*, Lard's ex post facto claim fails. In *Jones*, our concern was the improper delegation of legislative authority with respect to the procedures to be utilized in the implementation of the death penalty, not the death penalty itself. At the time of Lard's offense, capital murder was punishable by death. Ark. Code Ann. § 5-10-101(c)(1). Any change in the method of execution does not result in an increase in the quantum of punishment for capital murder, because the punishment, the option of death, remains the same. Accordingly, we find no error in the circuit court's rejection of Lard's argument that principles of ex post facto precluded the State from seeking the death penalty.

### VII. *Rule 10*

We take this opportunity to note that, while we have held that several of Lard's arguments on appeal have not been preserved for our review, we are mindful of our obligations pursuant to Rule 10 of the Arkansas Rules of Appellate Procedure–Criminal when a sentence of death has been imposed. Pursuant to Rule 10, the entire record has been reviewed, including those issues that we have held were not properly preserved for appeal,

31

and we hold that no reversible error exists. The record has also been reviewed pursuant to Arkansas Supreme Court Rule 4–3(i) (2013), and no reversible error has been found. For the foregoing reasons, we affirm the convictions and sentences.

Affirmed.

HANNAH, C.J., and CORBIN, J., dissent.

**DONALD L. CORBIN, Justice, dissenting**. Because I believe the majority has erred in its conclusions that evidence regarding statements made by Appellant while incarcerated and awaiting trial, as well as photographs depicting a tattoo on Appellant's back were properly admitted, I respectfully dissent.

At trial, the State sought to introduce into evidence a litany of prior bad acts committed by Appellant, as well as statements he made while awaiting trial and photographs of a "Hell Bound" tattoo that is on his back. In seeking to introduce this evidence, the State repeatedly argued that the evidence was relevant to its theory that Appellant has antisocial-personality disorder and to refute Appellant's claim that he was unable to conform his conduct to the law because he suffered from brain damage and a decreased mental capacity. Dr. Barry Crown testified as an expert witness for Appellant. According to Dr. Crown, he conducted a neuropsychological evaluation of Appellant and concluded that his intellectual functioning is in a category that would be considered impaired and disabled. Dr. Crown further stated that Appellant has significant neuropsychological impairment, which is a term for organic brain damage, and has functional impairment in the areas of memory, reasoning, judgment, and language-based critical thinking. Dr. Crown also opined that antisocial-personality


disorder is not an appropriate diagnosis for someone with brain damage like Appellant. On cross-examination, however, Dr. Crown admitted that Appellant is not mentally retarded and shows some level of critical thinking.

During the State's cross-examination of Dr. Crown, the prosecutor read through the diagnostic criteria for antisocial-personality disorder as set forth in the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) and questioned Dr. Crown as to whether Appellant had related information to him about specific bad acts that fell within those diagnostic criteria. Appellant objected several times on the basis that the State was "backdooring" evidence that would not be otherwise admissible. Appellant also pointed out that the State knew what information Appellant had related to Dr. Crown because the State had all the raw data in Dr. Crown's report. Appellant further argued that Dr. Crown did not deny that Appellant possessed certain characteristics of antisocial personality disorder but was of the opinion that it was not an appropriate diagnosis for Appellant, who he believed suffered from organic brain damage. The circuit court made several statements in overruling Appellant's objections, but the circuit court's overarching basis for allowing the State to elicit such questions was that Appellant had opened the door to the issue of antisocial-personality disorder.

What disturbs me about the circuit court's rulings with this line of questioning is that the circuit court, and now the majority on appeal, focuses almost exclusively on the fact that the evidence was relevant and fails to consider its prejudicial effect. In other words, I believe the circuit court abused its discretion when it failed to analyze whether the evidence's

probative value was substantially outweighed by the danger of unfair prejudice. *See* Ark. R. Evid. 403 (2013).[1] Of all the improper character evidence admitted, I am most concerned with the two instances I mentioned at the outset: the statements Appellant made while in custody and the photographs of Appellant's tattoo.

I turn first to the testimony of the two jailers. During the State's rebuttal, Jacob Saffell, an employee with the Craighead County Detention Center, testified that on July 30, 2011, he heard Appellant tell another inmate that, "It's funny that I shot one cop and the other one is still walking. I should have shot him, too." Appellant objected, arguing that the statement was too far removed in time and was admitted just to show that Appellant was a bad guy. The State countered that it went directly to the issue of Appellant's antisocial-personality disorder and lack of remorse. The circuit court overruled the objection without explanation.

The State next called Randal Ishmael, also a jailer in the Craighead County Detention Center. He testified that on August 5, 2011, he heard Appellant tell another inmate that "the only thing he regretted about that night was that he "didn't get the other motherfucker, too."

With regard to the issues of evidence of Appellant's bad acts and lack of remorse, the State argues generally that the circuit court did not abuse its discretion in admitting such

---

[1]The majority seemingly relies on Ark. R. Evid. 703 (2013) to support its general conclusions that the circuit court did not abuse its discretion in admitting this bad-character and bad-acts evidence because experts are allowed to disclose to the jury the factual basis for their opinions. This is troubling to me because the State does not raise this argument to us, and I can find no case where we have allowed an expert witness to testify to a defendant's prior bad acts over repeated objections that the evidence was inadmissible pursuant to Ark. R. Evid. 404(b). Moreover, the majority's reliance on the decision in *Miller v. State*, 2010 Ark. 1, 362 S.W.3d 264, is inapposite, as the objection to the evidence in that case was based on hearsay.

SLIP OPINION

evidence because such evidence, even if prejudicial, was relevant as it "refuted Appellant's claims of organic brain damage and indicated his lack of mistake and a plan, intent, or motive for shooting at Officer Schmidt and Sergeant Overstreet." The problem with this argument is that it presumes all relevant evidence, regardless of its prejudicial effect, may be admitted at trial. That is simply contrary to our Rules of Evidence and this court's case law.

The majority sidesteps this issue, however, by concluding that the admission of the jailers' testimony did not violate Rule 404(b) because it was not offered as character evidence but was, instead, independently relevant to refute Lard's claim of mental disease or defect. First, it does not matter that the State did not offer this evidence as character evidence. Second, while I question whether the evidence was relevant to refute Appellant's claim of mental disease or defect, even if there is some independent relevance to this evidence, the danger of unfair prejudice outweighs any such probative value. The majority, however, does not even consider the issue of prejudice.

Our law is clear that in order for evidence to be admissible under Rule 404(b), it must be relevant to prove the main issue independently from proving bad character. *See Green v. State*, 365 Ark. 478, 231 S.W.3d 638 (2006). The test for admissibility under Rule 404(b) is whether the evidence is independently relevant, which means it must have a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *Osburn v. State*, 2009 Ark. 390, 326 S.W.3d 771. However, even if evidence is independently relevant pursuant to Rule 404(b), Rule 403 provides that "evidence may be excluded if its probative value is substantially

SLIP OPINION

outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." This court has noted that evidence offered by the State in a criminal trial is likely to be prejudicial to the defendant "to some degree," otherwise it would not be offered. *Vance v. State*, 2011 Ark. 243, at 23, 383 S.W.3d 325, 341; *Rounsaville v. State*, 2009 Ark. 479, at 12, 346 S.W.3d 289, 296. Here, however, this testimony is not merely prejudicial "to some degree."

I recognize that in reviewing the admission of evidence under Rule 404(b), circuit courts have broad discretion in deciding evidentiary issues, and their decisions are not reversed absent an abuse of discretion. *Rounsaville*, 2009 Ark. 479, 346 S.W.3d 289. Here, however, I am convinced that the circuit court abused its discretion in admitting this evidence. I think any scant probative value it may have had was greatly outweighed by undue prejudice. The State had ample evidence to support its position that Appellant has antisocial-personality disorder. Both Dr. Rocho and Dr. Molden testified that Appellant exhibited a lack of remorse about killing Officer Schmidt and that such a lack of remorse was consistent with one of the characteristics of antisocial-personality disorder. And, while I recognize that the State is allowed to prove its case as conclusively as it can, the Rules of Evidence still apply.

Appellant also argues that the circuit court abused its discretion in allowing into evidence photographs depicting a tattoo on his back that says "Hell Bound" and shows a

scene of a cemetery.[2] Prior to admitting the photographs into evidence, the circuit court allowed the State to show the photographs to Dr. Crown and to ask him if the tattoo would be consistent with a particular type of individual. Dr. Crown admitted that the tattoo demonstrated the ability for artistic or abstract thought, but further opined that it did not necessarily suggest a higher order of functioning. The State later showed the photographs of the tattoo to its own expert, Dr. Rocho, who opined that the design demonstrated a person's ability to take a thought, plan it out, and draw it on paper. She admitted on cross-examination, however, that she did not have an opinion as to Appellant's functional ability. The State also showed the photograph to its other expert, Dr. Molden, who stated that it was a complex drawing, with a lot of attention to detail, and required concentration and planning, as well as some abstract thought.

The State then moved to introduce the two photographs of the tattoo during the testimony of Ricky Allan Lard, Appellant's brother, after Ricky testified that the photographs depicted a drawing done by Appellant. Appellant objected, arguing that he had provided the State with significantly less inflammatory examples of his artwork, and the State was simply trying to admit the photographs to show that Appellant is a bad person. Appellant further argued that he did not actually tattoo his own back and, thus, the photographs of his tattoo were not the best evidence of his actual artwork. The State countered that the photographs were admissible for several reasons, including that they demonstrated Appellant's artistic

---

[2]The photographs, which are of Appellant's back, were taken after Appellant had been shot by Sergeant Overstreet. Thus, there is also smeared blood seen in the photographs.

ability, his ability to have abstract thoughts, and were "very clearly a sign of someone who has an anti-social personality." The State conceded that the photographs were prejudicial but asserted that they were also probative and relevant.

The majority states that the photographs were offered to refute Appellant's claim of brain damage and were thus properly admitted into evidence as they were independently relevant. Although the majority briefly addresses the issue of prejudice, its ultimate conclusion is wrong. The majority holds that it can "find no manifest abuse of discretion in the circuit court's conclusion that the probative value of the photographs exceeded their prejudicial effect." But, the circuit court never reached that conclusion. The record demonstrates that the circuit court found that the photographs were not prejudicial and, accordingly, did not weigh the probative value of the photographs versus their prejudicial effect. At one point, the circuit court stated:

> The fact that it's on his back and a photograph was taken of his back at the time he was being treated for a gunshot wound he sustained during this incident, is not prejudicial and it's evidence that's already in front of the jury and this is not inflammatory in any shape or form. The content of the tattoo itself, I mean, frankly, the tattoo and the picture you showed that you're going to proffer, the intricacy of the design, that the court feels is the relevant portion and the State has a right to introduce that.

Clearly, the circuit court abused its discretion when it failed to even recognize that the photographs were in any way prejudicial and, thus, did not weigh the probative value of the evidence versus the prejudicial effect of it. The majority ignores this fact and instead substitutes its own finding; however, it is not in this court's purview to make its own findings.

This case is incredibly troubling to me. The murder of Officer Schmidt, while in the



line of duty, was senseless. But, despite the heinous nature of his crime, Appellant was entitled to a fair trial, and I am not sure that this trial comported with that standard. I have never reviewed a capital-murder case in which the State was allowed to introduce into evidence virtually every bad act and every bad character trait of the defendant. In fact, prior to trial, Appellant filed a motion for production of Rule 404(b) evidence. The State asserted that it did not intend to use such evidence unless Appellant opened the door to it. However, once the trial started, the State immediately began backdooring into evidence all of Appellant's bad acts and bad traits on the theory that it was relevant to demonstrate that Appellant has an antisocial-personality disorder and not brain damage. In my opinion, the circuit court abused its discretion repeatedly in allowing the State to elicit such evidence, even when it was information relied on by the experts. But, I am most troubled by the jailers' testimony and the photographs of the tattoos.

While I feel strongly that the circuit court abused its discretion in admitting the testimony of the jailers and the photographs of the tattoo, I am mindful that this court will apply a harmless-error analysis in a case where there is overwhelming evidence of guilt. There is certainly overwhelming evidence of Appellant's guilt in the instant case, and I cannot say that the verdict of guilt would have been different had the circuit court properly exercised its discretion and excluded this evidence. But, what I am concerned about in the instant case is the sentence of death imposed by a jury that was exposed to inadmissible and prejudicial evidence.

In my opinion, the majority is not properly adhering to this court's duty to conduct

a meaningful review of that sentence under Ark. R. App. P.–Crim. 10 (2013).  In my many years on this court, I have come to recognize that our review of the penalty phase in a death case should be performed with a heightened sense of due process because the finality of the punishment sets it apart.  We have acknowledged that a death sentence is different because it is a unique and irreversible punishment.  *See State v. Robbins*, 339 Ark. 379, 5 S.W.3d 51 (1999) (holding that this court is required to review the record in all death–penalty cases for egregious and prejudicial errors, even if a defendant waives his personal right to appeal in a death–penalty case); *see also Gregg v. Georgia*, 428 U.S. 153 (1976).  I do not believe that the majority's decision in this case comports with a heightened sense of due process.

While the majority makes a passing reference to Rule 10 in connection with arguments it deemed not preserved, it in no way considers the factors set forth under that rule. Not only does the majority fail to set forth the factors enumerated in Rule 10, I think it negligently fails to analyze subsection (vii), which requires this court to consider "whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor."  Thus, where as here, the erroneously admitted evidence was unduly prejudicial and was part of a pattern by the State to instill in the minds of the jurors that Appellant was an evil person deserving of the death penalty, I cannot say that the death sentence handed down in this case was not the result of passion and prejudice on the part of the jurors.  Accordingly, I would affirm Appellant's convictions but remand this case for a new sentencing hearing by a jury that has not been exposed to this prejudicial and inadmissible evidence.

HANNAH, C.J., joins in this dissent.

*Janice Vaughn*, Arkansas Public Defender Commission, for appellant.
*Dustin McDaniel*, Att'y Gen., by: *LeaAnn J. Adams* and *Rebecca Kane*, Ass't Att'ys Gen., for appellee.