Cite as 2020 Ark. 283

# SUPREME COURT OF ARKANSAS
No. CR-19-748

|  |  |  |
|---|---|---|
| | | **Opinion Delivered:** September 24, 2020 |
| ZACHARY L. ATWOOD | APPELLANT | APPEAL FROM THE FAULKNER COUNTY CIRCUIT COURT [NO. 23CR-16-504] |
| V. | | |
| STATE OF ARKANSAS | APPELLEE | HONORABLE CHARLES EDWARD CLAWSON, JR., JUDGE |
| | | AFFIRMED. |

**KAREN R. BAKER, Associate Justice**

On February 14, 2019, Zachary L. Atwood was convicted of capital murder by a Faulkner County Circuit Court jury. The circuit court sentenced Atwood to life imprisonment without the possibility of parole. From his conviction and sentence, Atwood presents three issues on appeal: (1) there was insufficient evidence for Atwood's capital-murder conviction; (2) the circuit court abused its discretion by admitting prior bad-act evidence that was not independently relevant and that was unduly prejudicial; and (3) the circuit court erroneously refused to permit Atwood to cross-examine Detective Garlington regarding prior inconsistent statements made by State witness Sunny Michelle Thomas––M.A's mother. We have jurisdiction over this case pursuant to Arkansas Supreme Court Rule 1-2(a)(2). We affirm.

I. *Facts*

On July 22, 2016, Atwood was charged with one count of first-degree murder in the May 31, 2016 death of three-month-old M.A. On December 11, 2018, the State filed an amended felony information and charged Atwood with capital murder in the death of M.A. The State's theory at trial was that Atwood had killed M.A. in a "meth[amphetamine] fueled rage."

At trial, the State called the following witnesses. First responders and medical personnel testified to receiving notices on May 31, 2016, to go to the Atwood apartment where medical aid was rendered to M.A. Kimberly Glover, a volunteer first responder with the Faulkner County Fire Department, testified that she responded to a 911 call for a nonresponsive three-month-old baby. Glover testified that she arrived at the Atwood apartment and performed CPR until MEMS arrived, but M.A. showed no signs of life. Glover testified that while at the scene, she observed that Michelle was hysterical and crying. She further testified that Atwood acted agitated, consistent with agitation shown by drug users.

Deputy Bobby Lockhard of the Guy Police Department testified that he also responded to the 911 call. He testified that Michelle was hysterical, crying, and emotional. Lockhard also testified that Atwood was "just standing there with a blank stare on his face," and later at the police station Atwood was very agitated, mad and cussing. Lockhard testified that he summoned two county officers to watch Atwood while he talked with

Michelle because Atwood was "everywhere all over the place, hollering, screaming and cussing."

MEMS EMT Brian Porter testified that he also responded to the 911 call and that calls regarding deceased babies are unusual. He testified that this particular call was unusual because Atwood showed no emotion and did not seem worried; he "just acted calm, cool and collected," which was unusual with the death of a family member, especially a child.

Alex Jenkins testified that he lived in the apartment adjacent to the Atwood apartment, and the night before M.A.'s death, Jenkins heard arguing and yelling coming from the Atwood apartment. Jenkins further testified that he observed Atwood using methamphetamine in the days prior to M.A.'s death and that Atwood was "angry about everything" when he used methamphetamine.

Deborah Moulton testified that she worked at the Thunderbird gas station in Guy, Arkansas, with Atwood's mother, Vicky Archer. Moulton testified that two days prior to M.A.'s death, she saw M.A. and noticed that he had a little bit of blood in his ears. Moulton further testified that the day before M.A.'s death, Archer and A.A., Archer's granddaughter and Atwood's daughter, came into the Thunderbird. Moulton testified that A.A. asked Moulton to buy her a doll. Moulton testified that after work she found a doll and then went to the Atwood apartment where Archer, M.A., A.A., Michelle, and Atwood resided. Moulton testified that Atwood seemed very agitated, mad, and aggravated and was

pacing back and forth, waiting on something; he kept going to the window, looking out for somebody and cussing that they had better get there before he had to go to work.

Mark Mahan with the Faulkner County Coroner's Office testified that he responded to the call regarding the death of three-month-old M.A. at Conway Regional Hospital where he took photos of the infant. Mahan further testified that he then went to Atwood's apartment where the death occurred and took photos of the scene.

Michelle testified that she was married to Atwood but the two had been separated for the previous year, and Atwood was not the father of M.A. Michelle testified that Atwood was aware of this, and the two had reconciled approximately one month prior to M.A.'s death. Michelle testified that two or three days prior to M.A.'s death, she noticed that M.A. was not being himself, that he was fussy and his cry was faint, and he wanted to be held more often. Michelle also testified that she told Atwood about the situation and also explained that M.A. had a bruise on his ear and they needed to take him to the doctor; that Atwood told her "little boys get bruises, that there was nothing to worry about;" that they did not have a car and did not have a way to get to a doctor or a hospital, nor did she have a phone. Michelle further testified that on the night before M.A.'s death, Atwood came home and the two argued; that Atwood was angry because Michelle had allowed their neighbor, Alex, to come over while Atwood was not home; and that during the night of May 30, 2016, she and Atwood had both used methamphetamine. She testified that Atwood had anger issues, but his use of methamphetamine caused his anger issues to escalate, and Atwood became very mean and agitated when he used

methamphetamine. Michelle further testified that on the morning of May 31, 2016, she and Atwood again used methamphetamine and attempted to have sex, but Atwood could not perform. They tried to have sex again, and she heard M.A. cry. Michelle testified that M.A.'s cry sounded like he was hungry and that Atwood told her to "lay there" and he would take care of M.A. Atwood left the room "severely aggravated" because of his inability to perform. Atwood returned approximately ten minutes later, and Michelle asked him if he had washed his hands before he made a bottle because Atwood had injected methamphetamine, and Michelle did not want the methamphetamine on M.A. or in his bottle. The two again attempted to have sex and Atwood was unable to perform. Michelle testified that she then went to shower but prior to showering checked on M.A., and he was asleep on his back. Michelle testified that she was in the shower 15–20 minutes and returned to their bedroom where Atwood remained irritated, and she heard this "god awful scream come from our daughter." Michelle opened their bedroom door and Archer was standing there with M.A., and he was blue and cold. Michelle testified that Archer started CPR on the couch as Michelle "tried to get to Alex's to call 9-1-1. [Atwood] pulled me down in the living room and told me, 'No, just wait, just wait.' And I kind of hit him and I said, 'No, we got to call 9-1-1. We've got to get help. We've got to get help.' I ran out the front door. I fell down. I got back up and I beat on Alex's door screaming at him, 'My baby is dead. My baby is dead. Call 9-1-1.'" Michelle further testified that she and Atwood rode with first responders and they followed the ambulance with M.A. to the hospital. Once at the hospital, the two waited in a room while medical personnel worked on M.A.

and Atwood "kept telling me to calm down and sit down they were going to know something was up."

Michelle further testified that after M.A. died, law enforcement called and asked the couple to ride with law enforcement to get the autopsy results. Michelle testified that at that point, they did not know the autopsy results, and Atwood said, "Jeremy, [M.A.'s biological father], is framing me for murder. I'm being framed for murder."

Michelle also testified that in the time leading up to M.A.'s death, she witnessed Atwood holding M.A. by his sleeper like a suitcase or a briefcase, and Atwood would carry M.A. around like that. She testified that she and Archer both told Atwood to "not be doing that because his neck muscles at three months are not completely strong enough to hold up his head. It could hurt him really bad." Finally, regarding Atwood's abuse, Michelle testified that "he would slam me down on the floor. He'd push me around. One time I had injured my leg and was on crutches. He threw my crutches away and make me crawl to get them several times and then he give me a black eye." Michelle further testified that Atwood would wake A.A. up "to see him hurt me. . . . He would tell me it was good that [A.A.] was seeing it. He wanted her to watch." Michelle testified that Atwood was also abusive to his mother, Archer; "he would shove on her, push her around. He threw [Archer] out the back door one day."

Michael Garlington, a homicide detective with the Arkansas State Police, testified that he was assigned to the M.A. case and interviewed Atwood on two occasions. The State introduced the custodial statements Atwood made to Garlington. Garlington interviewed

Atwood for the first time on June 2, 2016, after receiving the autopsy results. In the first interview, Garlington told Atwood that M.A. had died from blunt-force trauma to his head. Atwood responded to Garlington that he did not know how M.A. had been injured and that he loved M.A. and would never hurt him. Atwood stated that M.A. had been "real whiny" and spitting up a lot the week prior to his death. Atwood stated that on the day of M.A.'s death, he got up with M.A. around 8:00 a.m., fed him, changed his diaper, burped him, and then put him back in his crib. Atwood stated that he was then folding laundry and could see M.A. sleeping in his crib as he was walking around doing laundry. Atwood stated that during this time, he may have changed M.A.'s diaper again around 9:00 a.m., but he could not remember what happened between 9:00 a.m. and when Michelle called 911. During the interview, Atwood suggested that Michelle's mother may have dropped M.A. or that he may have rolled off the couch while she was changing his diaper. Atwood explained that Michelle's mother had seen the baby the week before his death and that she was disabled and could not "hang onto nothing but she was always wanting to . . . take the baby out of everybody's arms . . . [and] the baby could've rolled off the couch. She could've dropped the baby and not told anybody because she's that kind of person." Atwood further suggested that A.A. may have harmed M.A. by shaking him, playing too rough with him, or slipping and falling on top of him. Atwood stated that he would never intentionally hurt M.A. and explained that he had a temper: "I've got a bad temper . . . and that's why I am trying to get medicine . . . for . . . I would never take that . . . out on a baby." Garlington asked Atwood if while holding M.A. he had accidentally squeezed him

7

too tight. Atwood agreed that it was very possible and that it may have been what caused M.A.'s injuries.

Atwood was held overnight, and the following day, June 3, Garlington interviewed Atwood a second time. During the second interview, Atwood again stated that he loved M.A., did not know how he had received these injuries, and claimed A.A. had caused M.A.'s injuries. Later in the interview, Atwood told Garlington that while he was doing laundry, M.A. was on the couch and he accidentally sat on M.A.'s head. Atwood stated that he was folding clothes and setting the laundry on the couch, that he forgot M.A. was on the couch, and that he sat on his head. Atwood further explained that M.A. cried a little, and Atwood gave him his "binkie" and laid him back down to sleep in his crib. Atwood stated that he did not check on M.A. again and "prayed that he would be okay." Atwood stated that he went back to doing laundry, and an hour later they heard A.A. scream when she found M.A., who was deceased. At the end of the second interview, Atwood was allowed to visit with Michelle. Atwood stated that he knew he was "the bad guy" and did not ask for help because he was " terrified" and thought Michelle would "have killed [him]." Atwood explained that it was an accident and that he was scared. Michelle stated that she was angry with Atwood for waiting for someone to find M.A., for not telling her so she could get help, and for "pulling her back" when she was running to the neighbors to call 911.

Finally, in his statement to Garlington, Atwood stated that he had pushed his mother down. Atwood also stated that he told Michelle in the past that the only way

Michelle would leave him is if she left in a body bag, and he had said that to her "because he knew it would scare her." Atwood also stated that he had been violent with a Michelle "a few times."

Dr. Adam Craig, Associate Medical Examiner and Forensic Pathologist at the Arkansas State Crime Laboratory, testified that he performed an autopsy on M.A. Dr. Craig testified that M.A. had skull fractures on both sides of his head as well as bruising to the back of the head and injury to the front of the brain, which were separate from the skull fractures. Dr. Craig testified that M.A. had several contusions as well as bruising on his nose, foot, and arm. Dr. Craig further testified that M.A. suffered eleven retinal hemorrhages, which suggests some kind of acceleration or deceleration injury to the head. Dr. Craig testified that M.A. suffered multiple impact sites and multiple hemorrhages at different ages. Dr. Craig testified that the injuries M.A. sustained would have caused a change in M.A.'s behavior and would have required immediate medical attention. Dr. Craig testified that M.A. suffered blunt-force trauma to the head with contusions of the scalp and nose and fractures of the skull. Dr. Craig testified that the injuries were not consistent with a crush-type injury or falling off the couch.

Dr. Karen Farst, a pediatrician and expert in child physical abuse, testified as to her review of the autopsy findings. Dr. Farst testified that M.A.'s injuries were not from a single-crush event. She testified that "there [is] . . . not just a single act that would account for all of the injuries. . . . I don't think there was just a single event because you do have multiple different injuries on different parts of the skull. So there's at least four different

9

sites and then there are these two skull fractures. . . . I don't think it's possible to say what single event [led] to all of these. There . . . were multiple different injuries to the head that wouldn't be accounted for by just one event." Dr. Farst testified that a delay in treatment in M.A.'s case would have contributed to M.A.'s death. Dr. Farst further testified that it was possible that M.A. would have survived if medical attention had been sought.

Atwood called Dr. Robert Bux, a Board Certified Anatomical and Clinical and Forensic Pathologist from Colorado Springs, Colorado, to testify for the defense at Atwood's trial. Dr. Bux testified that he agreed in part with the testimony of the State's experts. Dr. Bux agreed that the cause of M.A.'s death was blunt-force trauma to the head but that the causation of that trauma was uncertain. He testified that the causation may have been from Atwood sitting on M.A. In other words, the bilateral skull fractures could have been caused by Atwood's sitting on M.A. On cross-examination, Dr. Bux testified that it was possible he would consider the findings in this case indicated abuse.

Based on the facts above, Atwood was convicted of capital murder and sentenced to life imprisonment without the possibility of parole. This appeal followed.

II. *Points on Appeal*

A. Sufficiency of the Evidence

For his first point on appeal, Atwood challenges the sufficiency of the evidence. We treat a motion for a directed verdict as a challenge to the sufficiency of the evidence. *Whitt v. State*, 365 Ark. 580, 232 S.W.3d 459 (2006). When reviewing a challenge to the sufficiency of the evidence, this court assesses the evidence in the light most favorable to

the State and considers only the evidence that supports the verdict. *Gillard v. State*, 366 Ark. 217, 234 S.W.3d 310 (2006). We will affirm a judgment of conviction if substantial evidence exists to support it. *Id.* Substantial evidence is evidence which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Ricks v. State*, 316 Ark. 601, 873 S.W.2d 808 (1994). Further, circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Id.* Whether the evidence excludes every other reasonable hypothesis is left to the jury to decide. *Id.* Finally, the credibility of witnesses is an issue for the jury and not the court. *Id.* The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.*

Atwood was convicted of capital murder under Ark. Code Ann. § 5-10-101(a)(9)(A) (Supp. 2019), which states in pertinent part:

> (a) A person commits capital murder if:
> . . .
>
> (9)(A) Under circumstances manifesting extreme indifference to the value of human life, the person knowingly causes the death of a person fourteen (14) years of age or younger at the time the murder was committed if the defendant was eighteen (18) years of age or older at the time the murder was committed.

Further, Ark. Code Ann. § 5-2-202 (Repl. 2018) provides in pertinent part, a person acts knowingly with respect to: (A) The person's conduct or the attendant circumstances when he or she is aware that his or her conduct is of that nature or that the attendant

11

circumstances exist; or (B) A result of the person's conduct when he or she is aware that it is practically certain that his or her conduct will cause the result. In the context of capital murder cases we have stated, "the words 'manifesting extreme indifference to the value of human life' indicate that the perpetrator of capital murder must act with deliberate conduct that culminates in the death of some person." *Flowers v. State*, 342 Ark. 45, 52, 25 S.W.3d 422, 427 (2000) (quoting *Sanford v. State*, 331 Ark. 334, 344, 962 S.W.2d 335, 340 (1998)). Finally, we have "held that lying about a crime can indicate a consciousness of guilt, *see Brenk v. State*, 311 Ark. 579, 847 S.W.2d 1 (1993), and a jury may properly consider an attempt to cover up one's connection to a crime as proof of a purposeful mental state. *See Terrell* [*v. State*], 342 Ark. 208[, 212], 27 S.W.3d 423[, 426 (2000)]; *Thompson v. State*, 338 Ark. 564, 999 S.W.2d 192 (1999). Circumstantial evidence of a culpable mental state may constitute substantial evidence to sustain a guilty verdict. *Terrell*, 342 Ark. at 212, 27 S.W.3d at 423 (citing *Steggall v. State*, 340 Ark. 184, 8 S.W.3d 538 (2000))." *Leaks v. State*, 345 Ark. 182, 186, 45 S.W.3d 363, 366 (2001).

With these standards in mind, we turn to Atwood's challenge to the sufficiency of the evidence supporting his conviction and sentence. Atwood contends that the State failed to prove he knowingly caused M.A.'s death. Atwood asserts that the medical evidence adduced at trial supports his position that the death was accidental. Further, Atwood contends that M.A.'s death was caused by blunt-force trauma to his head, but the causation could not be specifically determined, which supports Atwood's claim that the death was an accident. Based on this assertion, Atwood argues that the jury resorted to

12

speculation and conjecture in order to find that Atwood knowingly caused M.A.'s death. Further, Atwood contends that the circumstantial evidence did not exclude every other reasonable hypothesis, including Atwood's position that he sat on M.A.'s head. Atwood contends that he is a large man, and his expert's testimony supports his position that M.A.'s death was an accident. Relying on *Fudge v. State*, 341 Ark. 759, 763, 20 S.W.3d 315, 317 (2000), Atwood asserts that there are two equally reasonable conclusions as to what occurred merely give rise to a suspicion of guilt, and therefore, Atwood's capital-murder conviction must be reversed and dismissed due to insufficient circumstantial evidence.

Turning to the facts of Atwood's case, we must review the testimony presented. The evidence demonstrates that a few days before M.A.'s death, Michelle discovered a bruise on M.A.'s ear, he was acting fussy, his cry was faint, and he was not acting like himself. Michelle wanted to take M.A. to the doctor, but Atwood refused, saying that "little boys get bruises, that there was nothing to worry about." Atwood told law enforcement that M.A. had been "real whiny" and spitting up a lot the week prior to his death, but he did not seek medical attention and refused Michelle's request to take M.A. Michelle testified that on the day of M.A.'s death, once at the hospital, Atwood "kept telling [her] to calm down and sit down they were going to know something was up." The State's two medical experts both testified that Atwood's version of events was not supported by the medical evidence and was improbable in light of M.A.'s numerous injuries, including several that were of different ages, and the injuries were not consistent with Atwood's single-crush-event version of events. Dr. Craig testified regarding M.A.'s injuries: "This is the type of injury

13

that if it had occurred somebody would have known it and seek medical help or we would have gotten some indication from somebody in the investigation that some type of injury had occurred. But that didn't happen. So that leaves me to believe that whatever injuries occurred to the child were intentional and trying to be hidden." Additionally, Dr. Farst testified that M.A. suffered multiple injuries on different parts of the skull with four different sites on the back and top of his head and then the two skull fractures on the sides. She also testified that in her opinion M.A.'s injuries were not from a single-crush event, and M.A. might have survived had medical attention been rendered.

Further, the evidence demonstrates that Atwood attempted to prevent Michelle from seeking help for M.A. once he had been discovered cold and blue. Michelle testified that Atwood held Michelle back from running to the neighbor's apartment to call 911 and told her to "just wait." Additionally, Atwood denied knowing what could have caused M.A.'s injuries and repeatedly explained that his injuries were likely caused by A.A. or by his mother-in-law inadvertently harming M.A. In his interviews with law enforcement, Atwood stated it was possible that he may have accidently injured M.A. while holding him and then later in the interviews stated that he accidentally sat on M.A.'s head but did not seek medical help for M.A. Atwood admitted that M.A. was injured and attempted to cover it up because he feared Michelle would be upset with him. Finally, prior to receiving the autopsy results or meeting with law enforcement, Atwood explained that he was being "framed for murder."

Based on this record and in viewing the testimony in the light most favorable to the jury's verdict, we hold that substantial evidence supports the jury's conclusion that Atwood committed capital murder. There was sufficient evidence for the jury to find that Atwood had knowingly killed M.A. under circumstances manifesting extreme indifference to the value of human life. Accordingly, we do not find error and affirm the conviction

## B. Prior Bad-Acts Evidence

For his second point on appeal, Atwood contends that the circuit court abused its discretion in admitting evidence of prior bad acts that were not independently relevant and were unduly prejudicial. Atwood contends that the circuit court erroneously admitted the following evidence regarding Atwood's actions: (1) alleged acts of domestic violence against Atwood's mother, Archer; (2) alleged acts of domestic violence against his wife, Michelle; and (3) evidence of arguments that allegedly took place between Atwood and Michelle the night before M.A.'s death. Atwood contends that the evidence had no independent relevance and did not fall into any of the listed or known exceptions to Arkansas Rule of Evidence 404(b). Atwood presents three arguments in this point, which we address below.

We begin our analysis with the definition of "relevant evidence," which is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Ark. R. Evid. 401; *Lard v. State*, 2014 Ark. 1, at 6–7, 431 S.W.3d 249, 257–58. Next, Rule 404(b), "Character Evidence Not Admissible to Prove Conduct, Exceptions – Other Crimes," provides:

Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

We have explained that "the first sentence of [Rule] 404(b) sets out the general rule excluding evidence of a defendant's prior bad acts, while the second sentence provides an exemplary, but not exhaustive, list of exceptions to that rule. *Hamm v. State*, 365 Ark. 647, 232 S.W.3d 463 (2006). Evidence is not admissible under Rule 404(b) simply to show a prior bad act. *Laswell v. State*, 2012 Ark. 201, 404 S.W.3d 818. Rather, the test for admissibility under Rule 404(b) is whether the evidence is independently relevant, which means it must have a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *Vance v. State*, 2011 Ark. 243, 383 S.W.3d 325." *Lard*, 2014 Ark. 1, at 6–7, 431 S.W.3d at 257–58.

Further, "pursuant to Rule 403 of the Arkansas Rules of Evidence, 'evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.' Ark. R. Evid. 403 (2013). Therefore, a circuit court may refuse to admit evidence that is unfairly prejudicial to the defendant, even if it might be relevant. *Lockhart v. State*, 2010 Ark. 278, 367 S.W.3d 530. We have observed that evidence offered by the State is often likely to be prejudicial to the accused, but the evidence should not be excluded unless the accused can show that it lacks

probative value in view of the risk of unfair prejudice. *Chunestudy v. State*, 2012 Ark. 222, 408 S.W.3d 55." *Lard*, 2014 Ark. 1, at 6–7, 431 S.W.3d at 257–58.

Upon review, "the admission or rejection of evidence under Rule 404(b) is committed to the sound discretion of the circuit court, and this court will not reverse absent a showing of manifest abuse of discretion. *Dimas-Martinez v. State*, 2011 Ark. 515, 385 S.W.3d 238. Likewise, the balancing mandated by Rule 403 is also a matter left to a circuit court's sound discretion, and an appellate court will not reverse the circuit court's ruling absent a showing of manifest abuse. *Croy v. State*, 2011 Ark. 284, 383 S.W.3d 367. Abuse of discretion is a high threshold that does not simply require error in the circuit court's decision, but requires that the circuit court act improvidently, thoughtlessly, or without due consideration. *Craigg v. State*, 2012 Ark. 387, 424 S.W.3d 264, 2012 WL 4829813." *Lard*, 2014 Ark. 1, at 6–7, 431 S.W.3d at 257–58. Finally, a defendant must object at the first opportunity, and he must then renew his objection each time the issue is raised; otherwise, he has waived his argument regarding that issue on appeal. *Vaughn v. State*, 338 Ark. 220, 992 S.W.2d 785 (1999).

Regarding the specific evidence at issue, prior to trial, Atwood made an oral motion in limine asserting that testimony regarding Atwood's violence against Archer should be excluded and contending that the evidence was not admissible pursuant to Rule 404(b). The State responded that "there will be instances of violence against Michelle . . . and Archer that are relevant to show his mental state, that this wasn't necessarily an accident, that it goes to show this is an absence of mistake. The prior incident would be an absence

17

of mistake and show his mental state at the time." The circuit court agreed with the State and denied the motion, stating, "I think 404(b) provides for evidence regarding lack of mistake or an accident and my understanding is the contention is this was accidental. It involved a family member."

Next, Atwood also made a motion in limine regarding testimony that he and Michelle argued the night before M.A.'s death. Atwood argued that the evidence was not relevant, "it's not relevant or probative. It's - - there's really not any dispute that . . . Atwood and Michelle . . . were both meth addicts and whether or not they argued amongst themselves about methamphetamines or anything else isn't relevant to the issue of whether or not my client knowingly killed the child." The State responded that what was heard by the "witness that heard [the argument] is believed to be the result of [Atwood] . . . being upset and angry because he did not have drugs at that particular moment and, again, it goes to [Atwood's] state of mind over the course of the night and the morning." The circuit court agreed with the State and denied the motion in limine stating, "[R]elevance kind of depends on everything that surrounds it in my judgment. . . . So I'm going to allow it at this point. If that -- before that comes out in the course of the trial, if you want to renew your objection to relevance I'll have a better understanding of -- I think of the lay of the land -- if you will -- at that point and can make a better ruling on the objection. But at this point I'm going to allow it subject to your objection at the time it's offered."

At trial, Michelle testified that Atwood "would slam me down on the floor. He'd push me around. One time I had injured my leg and was on crutches. He threw my

crutches away and make me crawl to get them several times and then he give me a black eye." Michelle further testified that Atwood would wake A.A. up "to see him hurt me. . . . He would tell me it was good that [A.A.] was seeing it. He wanted her to watch." Michelle testified that Atwood was also abusive to his mother, Archer, "he would shove on her, push her around. He threw [Archer] out the back door one day." Finally, in his statement to law enforcement, Atwood admitted having a temper and being violent toward Archer and Michelle.

*1. Rule 404(b): the evidence was not independently relevant*

First, Atwood contends that the circuit court erred in admitting the evidence regarding his alleged violence against Archer and Michelle and that the evidence of his argument with Michelle the night before M.A.'s death should not have been admitted. Atwood contends that the evidence was not independently relevant and therefore not admissible pursuant to Rule 404(b). Specifically, Atwood contends that the evidence was not relevant to show absence of mistake or accident because he was not charged with alleged violence toward Michelle or Archer. Relying on *Russey v. State*, 322 Ark. 786, 788–89, 912 S.W.2d 420, 421–22 (1995), and *Tate v. State*, 367 Ark. 576, 580, 242 S.W.3d 254, 258 (2006), Atwood contends that the evidence at issue was not admissible pursuant to Rule 404(b) because it was not prior acts of domestic violence to the same victim, M.A., or the same class of victims, children. Atwood further asserts that the circuit court erred because there is not a similarity between the prior act and the charged act. The State responds that based on Atwood's accident defense, the evidence was properly introduced

19

to rebut Atwood's accident defense to show Atwood had been physically violent toward family members and to demonstrate his state of mind in the hours prior to M.A.'s death. Finally, the State responds that the crux of this case revolved around whether Atwood knowingly caused M.A.'s death and was not accidental, and the evidence was necessary to rebut Atwood's accident claim.

With regard to Rule 404(b) evidence, in *Russey*, 322 Ark. at 788–89, 912 S.W.2d at 421–22, the State was required to prove Russey purposely killed his wife. We allowed testimony from a detective that thirty-nine days prior to the murder, the detective responded to a disturbance call at the Russeys' residence; observed a loaded shotgun lying on a bed; and unloaded it and returned it to Russey. During his direct examination, the detective was shown the shotgun Russey had used in shooting his wife, and he said that it was the same gun he had seen at the disturbance call. "Because [Russey] claimed he shot his wife accidently, the detective['s] . . . testimony concerning the . . . domestic violence call was relevant to show lack of mistake or accident on [Russey's] part." *Id.*

Further, in *Tate*, 367 Ark. at 580, 242 S.W.3d at 258, we allowed the admission of evidence of violent acts toward the victim's roommate. In that case, Tate maintained that he accidentally fired the shot that killed the victim. Over Tate's objection, we allowed the admission of the evidence that two days prior to the murder, Tate intentionally fired the murder weapon at the victim's roommate inside the same house where the killing

20

occurred, in an apparent attempt to intimidate the victim's roommate. *Id.*[1] We affirmed the admission of the evidence and held that "the evidence of Tate's intentional discharge of the murder weapon in the manner and circumstance described above was relevant to show lack of mistake or accident." *Tate*, 367 Ark. at 580, 242 S.W.3d at 258.

In *Saul v. State*, 365 Ark. 77, 86, 225 S.W.3d 373, 380 (2006), Saul appealed his conviction for manufacturing methamphetamine and alleged that the circuit court erred by admitting Rule 404(b) evidence. At trial, the State introduced evidence of "prior crimes in order to show Saul's knowledge. The catalyst for doing so was Saul's claim to [law enforcement] that the methamphetamine lab found in his van [for which he was charged] was placed there by someone else and that he had no knowledge of its existence." *Saul*, 365 Ark. at 85, 225 S.W.3d at 379. We affirmed and explained that "this testimony is significant . . . because it shows a similar pattern of Saul's criminal activity—or, at least a similar pattern of how he responds to police officers when he is caught with drug paraphernalia. Two different times when he was caught with articles associated with a methamphetamine lab in his vehicle, he has claimed that they did not belong to him." *Id.*

More recently in *Coakley v. State*, 2019 Ark. 259, at 6, 584 S.W.3d 236, 239, we also addressed Rule 404(b) evidence and allowed the admission of prior acts toward the victim, the victim's brother, and the victim's cousin. Coakley's defense at trial for first-degree murder was justification. On appeal, Coakley challenged the admission of prior-acts

---

[1]As recounted in our opinion, the challenged evidence was a shooting of the victim's roommate, not the murder victim as Atwood has asserted in his brief.

evidence, arguing that Rule 404(b) prohibited its admission. We affirmed the admission of evidence regarding three prior similar incidents involving violence with (1) the victim two weeks before the murder; (2) the victim's brother two to three weeks before the murder; and (3) the victim's cousin three years before the murder. We held that the evidence was admissible because "despite [Coakley's] contention . . . that his intent was not an issue, his intent was at the crux of the jury's determination of guilt, as the jury was required to determine whether [Coakley] acted with the requisite intent for the charged offense or whether his act of shooting [the victim] was justified." *Id.*

Here, in his interviews with law enforcement, which were admitted to the jury, Atwood stated multiple times that he had never hurt M.A. Additionally, in his interviews he stated that he was not upset about having to take care of the baby because he wanted to be a family man for Michelle because he had always treated her poorly:

> I loved getting up [at night with the baby]. That's what I told her; you know? When she came back to ~ you know, because she carried the baby for nine months. I told her, you know, I love getting up with the baby every night through the night, take care of that baby for her. Because I use to be a . . . dickhead, man; you know? And that's something that I know I have to make up for it to show her that I'm really . . . being honest here. That's all I want is my family; you know? My mom has always been there for me. I didn't know why, but Michelle (inaudible) always been there for me; you know? And I've always treated her like shit and stuff . . . but want to be a real . . . family.

Later in the interview, Atwood admitted injuring M.A. but repeatedly claimed it was an accident. Atwood stated approximately thirteen times that M.A.'s death was an accident. As in *Russey*, *Tate*, *Saul*, and *Coakley*, Atwood's defense triggered admission of the

22

evidence at issue. Atwood's accident defense that he was a family man and that M.A.'s death was an accident allowed the admission of the evidence at issue to rebut his defense. Therefore, the evidence regarding his abuse against his wife and his mother was independently relevant and admissible to demonstrate the absence of mistake or accident.

Further, Atwood asserts that admitting evidence of Atwood arguing with Michelle the night before M.A.'s death has no bearing on whether Atwood knowingly caused M.A.'s death. Atwood contends that the evidence submitted regarding the argument the night before M.A.'s death only painted him as an unpleasant person who forbade his family from welcoming outsiders and was not independently relevant. The State responds that the evidence was properly admitted and urges us to affirm the circuit court. As discussed above, we likewise hold that the evidence depicting Michelle and Atwood arguing in the hours before M.A.'s death was independently relevant to demonstrate Atwood's state of mind and was admissible for this purpose.

For the reasons discussed above, the evidence was not offered to show the bad character of Atwood as he contends; rather, the evidence was independently relevant proof of Atwood's intent and the absence of mistake or accident in committing the offense. Therefore, it is admissible under the intent and absence-of-mistake-or-accident exception to Ark. R. Evid. 404(b).

*2. The evidence was admitted in violation of Rule 403 because it was unduly prejudicial*

Second, Atwood contends that the circuit court erred by admitting the evidence because any probative value the evidence offered was grossly outweighed by the dangers of

23

unfair prejudice, misleading the jury, and confusion of the issues. Accordingly, Atwood contends that the circuit court abused its discretion by refusing to exclude the evidence at issue pursuant to Rule 403. The State responds that Atwood failed to preserve his Rule 403 argument regarding the violence toward Archer and Michelle. We agree.

The record demonstrates that Atwood sought exclusion of the evidence at issue pursuant to Rule 404(b) and argued relevancy, but he did not assert that the evidence should be excluded pursuant to Rule 403 —that the evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. This argument was not presented to the circuit court, and therefore, we do reach the issue on appeal.

Atwood also contends that the circuit court erred when it admitted evidence regarding the argument between Atwood and Michelle the night before M.A.'s death. The State responds that this issue is not preserved as well. We agree. Although Atwood obtained a ruling in the pretrial hearing, the circuit court denied his motion and asked Atwood to renew his objection during the testimony at trial. However, Atwood did not renew the objection during the testimony. Therefore, the issue is not preserved for review. *Ward v. State*, 370 Ark. 398, 402, 260 S.W.3d 292, 296 (2007).

Based on our discussion above, we do not find error and affirm the conviction.[2]

---

[2]We recognize that Atwood also argues the circuit court's error was not harmless and urges this court to reverse the circuit court. On appeal, "this court will declare the error harmless and affirm the conviction when the evidence of guilt is overwhelming and the error is slight. *Buford v. State*, 368 Ark. 87, at 91, 243 S.W.3d 300, 303 (2006). To

## C. *Cross-Examination of Detective Garlington*

For his third point on appeal, Atwood contends that the circuit court erred in not allowing him to question Detective Garlington regarding a prior inconsistent statement made by Michelle. Michelle testified regarding Atwood's physical abuse toward her and making their daughter, A.A., watch. Detective Garlington testified that he interviewed Michelle around the time of the incident. Atwood sought to cross-examine Garlington regarding whether, during his interview with Michelle, Michelle had told Garlington that Atwood was abusive to her and had their daughter watch. The State objected, asserting that the response would be hearsay and inadmissible and outside the scope of direct examination. Atwood responded that he was not asking the question for Detective Garlington to make an out-of-court statement of the truth of the matter asserted. Rather, Atwood sought to establish through Michelle's silence that her testimony regarding abuse

---

determine whether the error is slight, we will look to see if the defendant was prejudiced. *Id.*" *Beard v. State*, 2020 Ark. 62, at 7, 594 S.W.3d 29, 33.

Although we do not find error, we note that the record demonstrates that the evidence of Atwood's guilt is overwhelming. Atwood admitted knowing that M.A. was fussy and whiny. Michelle had asked to take M.A. to the doctor, and Atwood refused. Atwood admitted that M.A. was injured and attempted to cover it up. Further, after M.A.'s death, Atwood lied to investigators. When Atwood later admitted having injured M.A., he claimed it was accidental, contending he sat on M.A.'s head. However, the medical evidence did not support Atwood's version of events. The State's two medical experts both testified that M.A. suffered numerous injuries, including skull fractures on each side of his head, additional multiple-impact events to the head, and contusions to his nose, arm, and leg. Further, the two medical experts testified that M.A.'s injuries would not have been caused by a single-crush event as depicted by Atwood.

was not true and that her testimony was false. The circuit court denied Atwood's request and allowed Atwood to proffer his belief that Garlington would testify that Michelle never told him that Atwood made A.A. watch him abuse Michelle, which would impeach significant negative testimony that Michelle gave against Atwood. On appeal, the State responds that the circuit court was correct in its ruling because Michelle was never asked, including by Atwood during her testimony, if she had told Garlington about the abuse. In sum, the State asserts that the circuit court was correct in its ruling preventing Atwood from asking Garlington about Michelle's silence because Michelle was never asked what she said to Garlington about abuse in front of A.A.

"The decision to admit or exclude evidence is within the sound discretion of the circuit court, and we will not reverse that decision absent a manifest abuse of discretion. The abuse-of-discretion standard 'is a high threshold that does not simply require error in the circuit court's decision, but requires that the circuit court act improvidently, thoughtlessly, or without due consideration.' Nor will we reverse absent a showing of prejudice." *Scamardo v. State*, 2013 Ark. 163, at 7, 426 S.W.3d 900, 904 (internal citations omitted).

Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." Ark. R. Evid. 801(c) (2019). Further, Rule 613 of the Arkansas Rules of Evidence provides in pertinent part:

> (a) Examining Witness Concerning Prior Statement. In examining a witness concerning a prior statement made by him, whether written or not, the statement need not be shown nor its contents disclosed to him at that

26

time, but on request the same shall be shown or disclosed to opposing counsel.

Ark. R. Evid. 613(a) (2019).

Here, the record demonstrates that Michelle was not asked what she said to Detective Garlington regarding abuse by Atwood in front of A.A. The record further demonstrates that Atwood cross-examined Michelle regarding her June 2 and June 16 interviews with Garlington. During cross-examination, Atwood impeached Michelle regarding her truthfulness in her first interview with Garlington regarding her drug use. Also on cross-examination, defense counsel questioned Michelle about her reconciliation with Atwood a month prior to M.A.'s death. Defense counsel specifically asked Michelle if she had told Garlington that Atwood was still violent at that time. Michelle responded in the affirmative, and defense counsel did not ask further questions regarding his violence. Accordingly, the record does not support the assertion that Michelle was asked about what she said to Garlington regarding the abuse in front of A.A. Based on our discussion above, we do not find merit in Atwood's argument and affirm the circuit court.

### III. *Rule 4-3(i) Review*

This case involves a sentence of life imprisonment; therefore, it is subject to review under Arkansas Supreme Court Rule 4-3(i). As required under Ark. Sup. Ct. R. 4-3(i), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Atwood, and no prejudicial error has been found.

Affirmed.

WYNNE, J., concurs.

HART, J., dissents.

**ROBIN F. WYNNE, Justice, concurring.** I join the majority in voting to affirm this case, but I write separately because I would affirm the second point on appeal under a different analysis. In my view, the circuit court abused its discretion by admitting prior bad-act evidence that was not independently relevant, but that error does not require reversal in light of all the circumstances of this case.

The evidence of Atwood's alleged violence toward his mother and his wife was not sufficiently similar to the crime charged—capital murder of an infant—to be independently relevant under Rule 404(b). Rather than showing his intent or absence of mistake or accident, the evidence served to portray Atwood as a violent person. As recounted in the majority opinion, however, Atwood challenged only the evidence regarding his mother in his oral motion in limine to the circuit court. Because he failed to raise an objection below to the admission of evidence regarding violent acts toward his wife, his argument on that point is not preserved for this court's review. *E.g., Frye v. State*, 2009 Ark. 110, at 7, 313 S.W.3d 10, 15 (parties cannot change the grounds for an objection on appeal but are bound by the scope and nature of their objections as presented at trial).

Even when a trial court errs in admitting evidence, we have held that when the evidence of guilt is overwhelming and the error is slight, we can declare that the error was harmless and affirm the conviction. *Barrett v. State*, 354 Ark. 187, 199, 119 S.W.3d 485, 493 (2003). To determine if the error is slight, we can look to see if the defendant was

28

prejudiced. *Id.* Here, because evidence of past violence toward his wife was introduced at trial without objection, I can discern no real prejudice to Atwood by the admission of evidence of violence toward another family member. Therefore, I respectfully concur.


JOSEPHINE LINKER HART, Justice, dissenting. I dissent. The jury's verdict was tainted by inadmissible evidence: allegations of prior acts by the defendant for which he was never charged. These allegations had no connection to the tragic death of M.A., the infant victim in this case. Essentially, the majority is allowing the State to introduce prior bad acts and uncharged crimes as direct evidence, totally unconnected to the charged act, to supplement a lack of clear proof in the case at bar.

Here, Atwood was charged with capital murder for the death of a three-month-old infant—a charge that tugs at the heartstrings of even the most unemotional persons among us. Likewise, it unites us in a desire to punish the offender. As a society, we abhor the act and despise the perpetrator. It is precisely this type of natural emotional response that requires our judiciary to be vigilant in its application of the rules designed to ensure a fair trial based on relevant evidence—lest we run the risk of convicting the innocent on their character, leaving the guilty to run free. These rules were developed over decades of time, tailored to ensure that evidence presented to our juries is relevant to the specific issues we ask them to assess. Today's decision renders meaningless Arkansas Rule of Evidence 404(b), a rule that was designed to be a cornerstone of our justice system. Instead of

affirming Atwood's conviction for capital murder, we should reverse and remand for a new trial.

First, the language of the rule. Arkansas Rule of Evidence 404(b) provides as follows:

> (b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Rule 404(b)'s first sentence operates as a general prohibition: one cannot use evidence of what a person may have done in the past to suggest that the person did the same thing on a particular occasion. Mandating the exclusion of such evidence is central to the truth-finding function of a jury trial. As this court observed over a half-century ago,

> The rule itself has been announced in some fifty decisions of this court and is so familiar that we need not discuss at length the reasons for its acceptance by every English and American court. Basically, the rule rests upon that spirit of fair play which, perhaps more than anything else, distinguishes Anglo-American law from the jurisprudence of other nations. Our theory is simply that a finding of guilty should rest upon proof, beyond a reasonable doubt, that the accused committed the exact offense for which he is being tried. We do not permit the State to bolster its appeal to the jury by proof of prior convictions, with their conclusive presumption of verity, and still less is there reason to allow the jury to be prejudiced by mere accusations of earlier misconduct on the part of the defendant. If the accused has committed other crimes, each may be examined separately in a court of law, and punishment may be imposed for those established with the required certainty. In this way alone can we avoid the elements of unfair surprise and undue prejudice that necessarily attend trial by accusation in place of trial upon facts demonstrated beyond a reasonable doubt.

*Alford v. State*, 223 Ark. 330, 333–34, 266 S.W.2d 804, 806 (1954).

Rule 404(b)'s second sentence, sometimes imperfectly characterized as a list of "exceptions" to the general rule, contemplates that evidence of one's prior acts may be nonetheless admissible if there is an alternative and independent purpose for which the evidence would be relevant, such as to show that the defendant knew what he was doing on a particular occasion, i.e., an "absence of mistake." In this situation, Arkansas law requires that there be a degree of similarity between the prior act(s) and the charged conduct. *Abernathy v. State*, 325 Ark. 61, 64–65, 925 S.W.2d 380, 382 (1996). "[T]he requirement of similarity in circumstances between the uncharged conduct and the charged crime also applies when the State offers the evidence to prove intent or the absence of mistake." *Id.*

With these principles in mind, let us consider the circumstances of the case at bar. We have a deceased victim—a three-month-old infant, M.A.—with blunt-force trauma to his skull. During the investigation, officers focus on Atwood, the man in whose home M.A., M.A.'s mother (Michelle), M.A.'s grandmother (Vicky), and M.A.'s half-sibling. (A.A., who was nine years old at the time) had all been living. All members of the household had unfettered access to the child and purported to participate in his daily care. No member of the household claims to have ever witnessed any deliberate incident that would have resulted in the child's death. Atwood tells police that he never subjected M.A. to any deliberate harm, but he does admit to accidentally sitting on M.A.'s head. Atwood says he was going through laundry to retrieve clothes for a shower when he accidentally sat down on M.A., who was situated on the couch. According to Atwood, M.A. began to cry, and

31

Atwood put M.A. in his bed and gave M.A. his binkie. M.A. was found dead the next morning.

Initially, the State charges Atwood with first-degree murder, which requires proof that the defendant knowingly caused the death of a person fourteen years of age or younger. Ark. Code Ann. § 5-10-102(a)(3). The State eventually offers Atwood a plea agreement whereby he will plead guilty in exchange for a recommended sentence of thirty years in prison. Atwood rejects this offer. In the wake of Atwood's rejection, the State amends its information to charge Atwood with capital murder, which requires proof that the defendant knowingly caused the death of another person fourteen years of age or younger under circumstances manifesting extreme indifference to the value of human life. Before trial, the State communicates another offer to Atwood: twenty-five years in prison with another fifteen suspended. Atwood rejects this offer as well.

At trial, Atwood's pretrial statement to police is introduced into evidence. A State expert testifies that the defendant's pretrial statement cannot explain M.A.'s injuries—that the injuries are inconsistent with a single crush event. Other experts disagree, testifying that M.A.'s injuries could have resulted in a single crush event or from a side-to-side compression. All of this evidence is helpful to the jury for purposes of the question it will ultimately have to answer: whether the State proved beyond a reasonable doubt that Atwood knowingly caused M.A.'s death under circumstances manifesting extreme indifference to the value of human life. *See* Ark. Code Ann. § 5-10-101(a)(9)(A).

The problem is with the other evidence the State used to convict Atwood—specifically Michelle's testimony alleging domestic abuse by Atwood. Before trial, the State notified Atwood that it would be presenting what it characterized as Rule 404(b) evidence through Michelle's testimony. Michelle, who had a duty to protect this child and was certainly not an unbiased witness, testified at length on direct examination about Atwood pushing her around, slamming her to the ground, giving her a black eye, and even taking her crutches from her while she was injured so that she would be forced to crawl about. These allegations obviously make Atwood look bad, cruel even, but they had nothing to do with the charged crime.

The circuit court allowed this evidence in over Atwood's Rule 404(b) objection, accepting the State's proposition that this testimony showed an "absence of mistake" with respect to Atwood causing M.A.'s death. With all due respect to the circuit judge and the majority, I flatly disagree. Specifically, the former is not probative of the latter. Specifically, Michelle's testimony about past spousal abuse does not help the jury determine whether M.A.'s death was an accident. Michelle and Atwood were an on-again, off-again married couple with an acrimonious relationship. They disagreed about drugs, what kind of visitors were allowed in their home, and it sounds like a great deal more. M.A., on the other hand, was a three-month-old infant who could not even speak yet. Note that the State's theory of the case was not that Atwood killed M.A. out of jealousy or retribution for Michelle's becoming pregnant while she and Atwood were estranged—there was no such evidence presented, and the State acknowledged that Atwood was a daily caregiver for M.A. and

held himself out as M.A.'s father. More broadly, spousal abuse is not inherently probative of child abuse, and the two should not be treated interchangeably. In this case, Michelle's accusations were not probative of whether M.A.'s death was an accident, so they were not admissible for those purposes.

The real reason the prosecution wanted these extraneous allegations admitted into evidence is obvious: this wasn't a slam-dunk case for capital murder. To support the State's charge, the prosecution had to prove beyond a reasonable doubt that Atwood knowingly caused M.A.'s death under circumstances manifesting extreme indifference to the value of human life. Atwood acknowledged that he had possibly harmed the child, but he maintained it was an accident, and there was expert testimony that the child's injuries could have happened the way Atwood described. It was possible that the jury would only convict Atwood of a lesser offense, such as manslaughter or negligent homicide, or perhaps even acquit Atwood altogether, concluding the prosecution simply failed to meet its burden of proof. But with the injection of these immaterial accusations from Michelle, the prosecution didn't have to present this case against Zachary Atwood, a man who is presumed innocent until proven guilty. Instead, the prosecution got to present this case against Zachary Atwood, the abuser—otherwise presumed innocent, but with the unrelated allegations of abuse being a focus of the trial. At closing argument, the prosecution went on at length about the domestic violence in Atwood's past, specifically arguing to the jury that there was a "link between people who are abusive in the home and physically abusive to children." To be clear, this is exactly what is *not* allowed—classic propensity evidence.

The cases the majority cites in support of its decision are inapposite. *Russey*, *Tate*, and *Coakley* all involved one's prior acts with adults being used to prove a violent crime committed against either the same or other adults—not against an infant with no similar relationship to the defendant. *Smith* didn't involve any allegations of violence whatsoever; that case involved prior acts that were definitively similar and even connected to the crime with which the defendant was charged: prior instances of possession of methamphetamine paraphernalia and shoplifting pseudoephedrine tablets offered in a prosecution for manufacturing methamphetamine.

A better case for comparison is *Abernathy v. State*, 325 Ark. 61, 925 S.W.2d 380 (1996). There, the defendant was charged with murder for killing his seventeen-year-old girlfriend. At trial, the State presented evidence of the defendant's prior intentional violence against his stepbrother, purportedly to show an absence of mistake with respect to Abernathy killing his girlfriend. On appeal, the Supreme Court of Arkansas ruled that allowing this evidence was error:

> We are mindful of the State's burden to prove that appellant killed Kendra with the purpose of doing so. Nevertheless, we can find no logical connection between the uncharged acts perpetrated against appellant's stepbrother and the killing of his girlfriend in the present case. The trial court remarked that appellant's act of kicking his stepbrother in the head is similar to what is alleged in the present incident. Yet to accept that this evidence was relevant would require an inference that if appellant shot his stepbrother in the legs and kicked him in the head afterwards, he therefore had the purpose to kill his girlfriend when he hit and kicked her one year later. Because we conclude that the uncharged act perpetrated against Sam was not sufficiently similar to the charged offense, we hold that the trial court abused its discretion in admitting Sam's testimony at trial.

35

*Abernathy*, 325 Ark. at 65, 925 S.W.2d at 382 (internal citations omitted).[1] The *Abernathy* court's analysis is instructive here. The way one treats his stepbrother is not inherently probative of how he treats his girlfriend, and the way one treats his spouse is not inherently probative of how he treats an infant.

Note that the majority is not affirming on the basis of a harmless-error analysis (which would also be inappropriate in this case)[2]—the majority refuses to even acknowledge that allowing these prior bad acts to be admitted for this purpose was an evidentiary error. In the future, this case will be cited as precedent, and the reliability of our jury-trial system will diminish because of it.

Jim Hannah, this court's former Chief Justice, once said:

I concur in affirming this case, but on the basis of harmless error. In considering the majority's reasoning, I must state that this case yet again raises concern for the current validity and future viability of the longstanding

---

[1] *See also Hortenberry v. State*, 2017 Ark. 261, at 13, 526 S.W.3d 840, 848 ("Under the pedophile exception, we have approved allowing evidence of similar acts with the same or other children when it is helpful in showing a proclivity for a specific act with a person or class of persons with whom the defendant has an intimate relationship. We decline to expand the pedophile exception to include evidence of a defendant's similar acts with an adult."). This court affirmed *Hortenberry* "under the unique facts and very limited circumstances of [that] case," holding that the testimony was relevant for an independent and alternative purpose other than the pedophile exception. 2017 Ark. 261, at 14, 526 S.W.3d at 848–49.

[2] I note that while the members of the jury were deliberating, they sent out a note with the following question as read by the circuit court: "Before we can move to discussing a lower charge; for example, First Degree Murder, do all twelve jurors have to agree it is not Capital Murder or can we move to lower charges when everyone agrees?" R. 891–92. It appears that the circuit court's response was that the jury must follow the transition instructions they had already been given. I also note that it is unclear whether the defendant was present for this exchange. *See Terry v. State*, 2019 Ark. 342.

rule that character evidence is not admissible to prove conduct in conformity with that character. If the rule has not yet been swallowed up by its exceptions, then the rule has so far descended into the gaping maw of the exceptions that the rule is all but lost. The application of the rule in both our trial and appellate courts has deteriorated to the point that legal analysis of the issue of admissibility of character evidence most often begins, and ends, with the assumption that the issue of admissibility of character evidence is only a matter of picking the exception that fits best.

*McCoy v. State*, 354 Ark. 322, 328, 123 S.W.3d 901, 905 (2003) (Hannah, C.J., concurring). I fear that the unfortunate day Justice Hannah described has now come and gone. At some point, this court must grapple with the fact that its decisions concerning the rules of evidence are inconsistent with what law students here and around the country are learning from their professors.

I dissent.

*Michael Kiel Kaiser*, *William O. "Bill" James, Jr.*, and *Megan M. Wilson*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Jacob H. Jones*, Ass't Att'y Gen., for appellee.